**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| TROPICAL CHILL CORP., et al., | |
| Plaintiffs, | |
| v. | CIVIL NO.: 21-1411 (RAM-MEL) |
| PIERLUISI URRUTIA, et al., | |
| Defendants. | |

**REPORT & RECOMMENDATION**

Plaintiffs Tropical Chill Corp. ("Tropical Chill"), Jasmín Vega González ("Ms. Vega"), Eliza Llenza ("Ms. Llenza"), and René Matos Ruiz ("Mr. Matos") bring suit pursuant to 42 U.S.C. § 1983, 28 U.S.C. §§ 1331, 1343(a), 2201, and 2202 against the Honorable Pedro R. Pierluisi Urrutia ("the Governor"), in his official capacity as Governor of the Commonwealth of Puerto Rico, and against Carlos R. Mellado López in his official capacity as Secretary of Health of the Commonwealth of Puerto Rico (collectively "Defendants"). ECF No. 7 at 1; ECF No. 35 at 1, 8. Specifically, Plaintiffs challenge Executive Order No. 2021-075 ("EO75") and Regulation of the Secretary of Health No. 138-A ("Regulation 138-A"). Plaintiffs contend that EO75 and Regulation 138-A violate their substantive due process rights under the Fourteenth Amendment of the United States Constitution. Ms. Vega also argues that EO75 violates her rights under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-§ 3 2000bb. Finally, Plaintiffs invoke the court's supplementary jurisdiction to allege that EO75 and Regulation 138-A violate the Puerto Rico Constitution. Plaintiffs amended the complaint, filed a Rule 15(d) supplemental pleading, and moved for a preliminary injunction to prevent the implementation and enforcement of EO75 and Regulation 138-A—the subject of this report and

recommendation. ECF No. 35; ECF No. 67; ECF No. 7. Defendants have opposed the request for preliminary injunction. ECF No. 20. The court held a preliminary injunction hearing during which Plaintiffs and Defendants presented evidence and arguments. After considering the arguments of the parties, the pertinent authorities, and the evidence produced at the evidentiary hearing, Plaintiffs' Motion for Preliminary Injunction should be denied.

## I.    EXECUTIVE ORDER 75 & HEALTH REGULATION 138-A

The challenged government mandates were promulgated by the government of Puerto Rico in response to the SARS-CoV-2 coronavirus pandemic, an outbreak more commonly known by the name of the disease caused by the coronavirus—the COVID-19 pandemic.

### A.  Regulation 138-A

On August 5, 2021, the Puerto Rico Department of Health issued Regulation 138-A, an amendment of Health Regulation 138, which requires proof of COVID-19 vaccination as "an essential document for a doctor to issue a health certificate." ECF No. 35-1 at 2. A health certificate is required to work in many different occupations in Puerto Rico. Regulation 138-A provides for a medical exemption for those cases where "the patient has a compromised immune system or there is a medical contraindication that prevents inoculation. This must be certified by a doctor authorized to practice in Puerto Rico or by the doctor who issues the health certificate." ECF No. 35-1 at 3. If a medical contraindication is temporary, a doctor must so certify, and the person is required to comply with the vaccination requirement to be issued subsequent certificates. ECF No. 35-1 at 3. Regulation 138-A also provides a religious exemption whereby a person may show a sworn statement to the issuing doctor "in accordance with the Executive Orders in force" proving that the "vaccine goes against the dogmas of the patient's religion." ECF No. 35-1 at 3. There are no other exemptions to the COVID-19 vaccination requirement

under Regulation 138-A. Regulation 138-A remains in effect at the time of this report and recommendation.

### B.  Executive Order 075

In August 2021, the Governor of Puerto Rico issued Executive Orders 2021-062, 2021-063, and 2021-064. ECF Nos. 35-2; 35-5; 35-6. On November 15, 2021, the Governor issued Executive Order 2021-075 which consolidated the existing COVID-19 executive orders and expressly repealed executive orders 062, 063, and 064. Joint Exhibit I at 32. EO75 is the executive order challenged in this case.

Section 6 of EO75 requires employees and contractors who work in public agencies of the Commonwealth of Puerto Rico, and contractors and their employees who frequently visit government offices to either (1) supply proof to their employers of being "fully vaccinated" against COVID-19; (2) be tested every 7 days for COVID-19; or (3) to furnish their employers a positive COVID-19 test result performed within the last 3 months along with a letter from a healthcare provider or government official certifying they have recovered. Joint Exhibit I at 17. For these government employees and contractors, Section 6 does not require them to furnish "the documents associated with a medical or religious exception" to comply with the second or third option. Joint Exhibit I at 17.

Section 9 of EO75 establishes that private sector employees and persons working at "hotels, . . . lodgings, restaurants (including fast foods, food courts, and cafeterias)[,] . . . small cafeterias, . . . [and] supermarkets" must (1) show proof to their employer of being "fully vaccinated" against COVID-19; (2) be tested every 7 days for COVID-19; or (3) to furnish their employer a positive COVID-19 test result performed within the last 3 months and evidence that they have recovered. Joint Exhibit I at 25. In addition, Section 9 commands that any business

that has 50 or more employees require that its employees comply with one of the same three conditions. Joint Exhibit I at 25. Section 9 makes "[e]very employer, merchant, owner, manager, or similar person" responsible for checking that employees in their business are complying with EO75. Joint Exhibit I at 26. No exemptions for any reason are listed.

Section 10 establishes that "restaurants (including fast foods [*sic*], food courts, and cafeterias)[,] bars, "chinchorros," small cafeterias, sports bars, theaters, movie theaters, stadiums, convention and activity centers that sell alcoholic beverages or prepared food, hotels, *paradores*, lodgings, beauty salons, barber shops, aesthetics salon [*sic*], spas, gyms, and casinos" are required to check that all visitors to their businesses comply with one of three requirements. Joint Exhibit I at 27. The visitor must either (1) show proof of being "fully vaccinated" against COVID-19; (2) furnish a negative COVID-19 test performed within the last 72 hours prior to the visit; or show a positive COVID-19 test result performed within the last three months accompanied with documents evidencing the visitor's recovery and ability to be in a public space. Any business covered in Section 10 that prefers not to check the vaccination or COVID-19 test status of their customers is required to "limit the capacity of the business to 50%, in accordance with the building code in effect." Joint Exhibit I at 29. Section 10 exempts children younger than the age of five who cannot yet be vaccinated until January 31, 2022 "given that the vaccination process for them is under way." Joint Exhibit I at 28. No exemptions for any other reason are listed for either visitors to or the owners of the businesses falling under Section 10.

Section 13 mandates that the Department of Health continue to facilitate testing to detect the virus. Section 13 also requires that the Department of Health publish "in electronic media, including on the webpage of the Department of Health, the locations where testing is being conducted." Joint Exhibit I at 30.

4

Finally, as relevant to this case, Section 14 establishes the penalties for non-compliance with EO75. Any person or business who fails to comply with EO75 is subject to criminal prosecution under 25 L.P.R.A. § 3654 and subject to a penalty of a term of imprisonment not more than 6 months, or a fine of not more than $5,000, or both. Joint Exhibit I at 30. Section 14 also states that the same non-complying person could also be subject to Section 33 of the Organic Act of the Department of Health, and subject to conviction for a misdemeanor carrying the penalty of up to six months imprisonment and up to a $5,000 fine. Joint Exhibit I at 30. Additionally, for anyone who fails to comply with EO75 for a second time within the term of one year, "the fine imposed may be raised to a maximum of ten thousand dollars ($10,000)." Joint Exhibit I at 31.

## II.    PROCEDURAL BACKGROUND

On August 27, 2021 Plaintiffs initiated this suit by filing a "Complaint for Declaratory and Injunctive Relief." ECF No. 1. Four days later, on August 31, 2021, Plaintiffs filed the instant "Motion for Preliminary Injunction and Hearing" to which Defendants responded in opposition on September 16, 2021. ECF No. 7; ECF No. 20. Plaintiffs filed a "Reply to Opposition to Motion for Preliminary Injunction" on October 4, 2021 to which Defendants surreplied on October 15, 2021. ECF No. 29; ECF No. 42. Plaintiffs filed the first "Amended Complaint for Declaratory and Injunctive Relief" on October 7, 2021. ECF No. 35; ECF Nos. 40, 41. On November 23, 2021, following the issuance of Executive Order 075, Plaintiffs filed a "Rule 15(d) Supplemental Pleading." ECF No. 67.

On December 6, 7, 8, 9, 13, and 14, 2021, the court held an evidentiary hearing during which both parties were provided an opportunity to present evidence. In addition to the testimony of all four Plaintiffs, Plaintiffs also presented the testimony of four expert witnesses,

one lay witness, and introduced 65 exhibits.[1] During their presentation of the evidence

Defendants introduced the testimony of three expert witnesses and eight exhibits. The parties

also introduced three joint exhibits.[2] On the last day of the evidentiary hearing, Plaintiffs filed a

"Motion Requesting Order for Judicial Notice" in which they requested the court take judicial

notice of 18 items. ECF No. 83. Defendants opposed Plaintiffs' motion for judicial notice. ECF

No. 89. On December 27, 2021, Plaintiffs tendered a "Second Rule 15(d) Supplemental

Pleading"; ECF No. 95; ECF No. 97. The court has not yet ruled on whether to allow a second

supplemental pleading. ECF No. 98.[3]

### III.    FACTUAL BACKGROUND & CLAIMS

Plaintiffs specifically challenge two parts of the government mandates. First, they

challenge the requirements under EO75 for private businesses to check the vaccination or

COVID-19 test status of patrons. ECF No. 35 at 2; ECF No. 67 at 1–2. Second, Plaintiffs

challenge the requirement of proof of COVID-19 vaccination to obtain a health certificate under

Regulation 138-A. ECF No. 35 at 2. The circumstances as to each Plaintiff are as follows.

### A. Tropical Chill Corp.

Plaintiff Tropical Chill operates three ice cream stores, with one location in San Juan, a

second location in Guaynabo, and a third location in Dorado, Puerto Rico. ECF No. 27 at 35.

Tropical Chill's San Juan location is 1500 square feet and operates a drive through, the

Guaynabo location is 1400 square feet, and the Dorado location is 400 square feet located in the

---

[1] The exhibits referenced in this report and recommendation have kept the same identification numbers and letters used during the evidentiary hearing.

[2] In the days following the evidentiary hearing, Plaintiffs and Defendants submitted certified translations of exhibits that were introduced in the Spanish language. ECF Nos. 86, 88.

[3] Since the preliminary injunction hearing, the Governor has issued new or additional Executive Orders regarding the COVID-19 pandemic, the certified translation of which has not been submitted to the court. The Plaintiffs' tendered "Second Rule 15(d) Supplemental Pleading" aims to address these new mandates. ECF No. 95-1. However, inevitably the fast-paced developments of the pandemic and the continuously changing executive orders present a constantly moving target for judicial review as new circumstances develop.

food court area of a shopping center. The owner of Tropical Chill, Jaime Vega, who testified at the preliminary injunction hearing on December 6, 2021, is a strong believer in the efficacy of vaccinations and his entire family is vaccinated against COVID-19. However, according to Mr. Vega, the vaccine checks required of restaurants by EO75 severely inhibits the business model of Tropical Chill and has resulted in unsustainable financial losses for the corporation.

The mission statement of Tropical Chill is to "sell[] ten minutes of happiness to our customers" through serving ice cream in a family environment. Hearing, Dec. 6, at 9:23 AM. When presented with the option of checking vaccination status or operating at 50 percent capacity, Mr. Vega decided that inquiring into the vaccination status of his customers was uncomfortable, improper, and undermined the happy experience Tropical Chill seeks to provide. Mr. Vega also conveyed that Tropical Chill's employees were not comfortable asking about the vaccination status of customers. Mr. Vega explained that the requirement also put his employees in the difficult position of trying to determine the true age of a child to know whether EO75 would require that child to be vaccinated to enter the store.

Secondly, Mr. Vega explained that as a small-business owner he "run[s] a very tight ship," meaning that he must keep costs low. Hearing, Dec. 6, 9:42 AM. For example, to keep costs down, Mr. Vega personally acts as a plumber, a handyman, or in any other role needed at Tropical Chill's three stores. Hearing, Dec. 6, at 9:42 AM. As a matter of expense, Mr. Vega testified that he did not believe it would be financially feasible for him to hire an extra employee dedicated to check the vaccination status of patrons or to take orders outside the store because that practice would not result in fewer losses than what he is incurring by operating at 50 percent capacity. Hearing, Dec. 6, at 10:17–10:18 AM. However, Mr. Vega has not attempted any such procedure because he did not want to "bend [his] beliefs to get more customers." Hearing, Dec.

6, at 10:17–10:18 AM. Mr. Vega acknowledged that he was not sure whether customers had been turned away because any store had reached its full 50 percent capacity. Mr. Vega explained that the stores only log transactions rather than the number of visitors. However, he testified that the San Juan store, which includes the option of a drive through, has been the store that has incurred the biggest losses in sales. Hearing, Dec. 6, at 10:19 AM

For the above reasons, Mr. Vega decided that Tropical Chill would only operate at 50 percent capacity rather than check the vaccination status of its customers. Accordingly, since mid-August 2021 when the vaccine check requirement was announced, revenue from Tropical Chill's three stores decreased significantly. Mr. Vega reported that Tropical Chill's revenue in the three months preceding the mandate totaled $235,000, while the revenue for the three months after the mandate was $190,000. Hearing, Dec. 6, at 9:30 AM. This change amounted to lost revenue of "almost 20 percent for those months" after the executive order was issued. Hearing, Dec. 6, at 9:30 AM. Mr. Vega dismissed seasonality as a cause for the decrease testifying that in the 13 years he has operated Tropical Chill, seasonality led to a decrease in sales of only about two to four percent. Hearing, Dec. 6, at 9:30 AM. As a result, Mr. Vega stated that Tropical Chill is operating at a loss, Mr. Vega has not collected a salary in the month, and the stores have cut employee hours. Mr. Vega estimated that Tropical Chill could continue to operate under the current restrictions for 30 to 60 days before the losses would result in employee layoffs.

As such, Tropical Chill alleges that EO75 infringes upon Tropical Chill's right to earn a living and use its property as it sees fit, without sufficient government justification for restricting or infringing on those rights. ECF No. 35 at 29. Tropical Chill also claims that EO75 compels it to violate its customers' constitutional right to privacy. ECF No. 35 at 32.

### B.  Jasmín Vega González

Plaintiff Jasmín Vega owns and operates a short-term rental property through the platform Airbnb near Mayagüez, Puerto Rico. The property is called "Hillside Cabin" and is located on a mountain in the countryside. The cabin itself is located 200 feet from the entrance of the property and the closest neighbor to the structure is 220 feet away. The property has a maximum capacity of four people. Security cameras are located at the entrance and parking area to monitor ingress and egress to the property. Ms. Vega testified at the preliminary injunction hearing that for guests to make a reservation at the cabin they must provide personal information confirming that all the guests are relatives. Ms. Vega stated that she does not permit parties or events on the property. However, guests of Hillside Cabin are free to come and go to the property and visit local attractions. According to Ms. Vega, she never has personal contact with any of the guests.

Ms. Vega explained that because of her religious convictions she does not believe in vaccinations and has refused to be vaccinated for any reason since the age of seventeen. She is opposed, on account of her faith, to all mandates requiring her to check for proof of vaccination or to ask for a negative COVID-19 test result. Her "personal and religious interpretation is that we are reaching the last days" and these requirements, she explained, are part of the "mark of the Beast" described in Chapter 13 of the Book of Revelation of the Bible. Hearing, Dec. 7, at 2:27 PM. Ms. Vega objects to participating in the checks because her compliance makes her an "accomplice of everything." Hearing, Dec. 7, at 1:49–1:52 PM. According to Ms. Vega, her own personal refusal to be vaccinated results in her feeling marginalized, and reminds her of "back in the day, as the Bible says, some had to run, flee, hide, and whoever believed in God and spoke about God was killed." Hearing, Dec. 7, at 1:56–1:57 PM.

Ms. Vega testified briefly as to the impact she believes EO75 is having on Hillside Cabin. Ms. Vega has only operated Hillside Cabin since December 2020. Before the executive order requiring vaccine checks or proof of a negative COVID-19 test were required, Ms. Vega reported that for several months Hillside Cabin had a fully booked occupancy for "two or three months in a row." Hearing, Dec. 7, at 2:41 PM. After the issuance of the executive order, her property is usually occupied about 20 nights a month. Hearing, Dec. 7, at 2:09 PM; 2:41 PM. However, when asked whether as the owner she was actively checking whether her guests were vaccinated or had a negative COVID-19 test to stay at Hillside Cabin, she refused to answer, invoking the Fifth Amendment. Hearing, Dec. 7, at 2:28 PM.

Ms. Vega claims that EO75 deprives her of her right to earn an honest living, without sufficient justification for restricting or infringing on her rights. ECF No. 35 at 32. Second, she alleges that EO75 compels her to violate her guests' constitutional right to privacy. ECF No. 35 at 32. Third, Ms. Vega claims that EO75 burdens her constitutional rights to privacy, personal autonomy, bodily integrity, and medical choice because she must be vaccinated or submit to a COVID-19 test whenever she wants to go to a restaurant or participate in other activities. ECF No. 35 at 32. Finally, Ms. Vega brings a claim under the Religious Freedom Restoration Act, claiming that EO75 violates her religious beliefs by obligating her to verify vaccination status, thereby leading her "to participate in and condone forced vaccination." ECF No. 35 at 36.

### C. Eliza Llenza

Plaintiff Eliza Llenza is currently unemployed but is seeking employment. Ms. Llenza contracted and tested positive for COVID-19 in December 2020. Exhibit 42. On June 25 and September 17, 2021 Ms. Llenza presented lab tests which showed she still had antibodies for the SARS-CoV-2 virus. Exhibit 43, 44. Ms. Llenza believes these antibodies give her natural

immunity from the COVID-19 virus, and so has declined to be vaccinated. However, Ms. Llenza acknowledged that she has not consulted with a doctor about whether she should be vaccinated, nor has any doctor advised her not to be vaccinated. Ultimately she stated on cross-examination that her decision to be unvaccinated was "a personal decision of mine based on my lifelong experience. I know as a fact that when you get a virus of some sort you develop immunity." Hearing, Dec. 8, at 10:18 AM.

Ms. Llenza last worked as a field inspector for a private contractor selected to participate in a local disaster relief program in Puerto Rico after Hurricane María. Since her date of last employment, Ms. Llenza received training in "Planning for Disaster Debris Management" from the Federal Emergency Management Agency (FEMA) and in "Mold Clean-Up and Safety after Disasters" from Ana G. Méndez University. Exhibits 39, 40. However, Ms. Llenza believes that she can no longer work in disaster recovery for which she has been trained because EO75 requires her to be vaccinated.

Ms. Llenza was also certified as a "Professional Food Manager" in December 2019. Exhibit 41. She, however, does not have any experience in food management. Ms. Llenza also explained that positions in food preparation are no longer available to her because they would require she be vaccinated to obtain a health certificate, which she does not currently have.

Ms. Llenza sought a health certificate in 2021 after hearing that jobs were available in the food industry, such as at hotels and restaurants. Accordingly, Ms. Llenza began the health certification process with a doctor's office in August 2021 but testified that the office manager told Ms. Llenza that she would not be able to finish the health certification process unless she could present evidence of COVID-19 vaccination. Finally, Ms. Llenza also has a degree in

medical billing, but she does not believe she could get a job in a doctor's office because such a position would require that she be vaccinated and have a health certificate.

Ms. Llenza described that the challenged vaccine mandates have also impacted her ability to look for work and has impacted her personal life. Ms. Llenza discussed how the mandates have made it difficult for her to attend job fairs or interviews unless she can plan far enough ahead to get a test. She also testified how the requirement for vaccination or testing prevents her from seeing her children play in sports events, attend art exhibits, or even go to outdoor festivals. Ms. Llenza lamented that "she is treated practically as a criminal" because she is stopped at entrances when before she has never had to have anyone stop her anywhere.

For the above reasons, Ms. Llenza claims that EO75 and Regulation 138-A prevent her from obtaining employment in the fields for which she is trained, namely because to work in government or as a government contractor she is required by EO75 to be vaccinated, and because vaccination is required by Regulation 138-A to obtain a health certificate to work as a Professional Food Manager. ECF No. 35 at 29–30. Likewise, Ms. Llenza alleges that EO75 burdens her constitutional rights to privacy, personal autonomy, bodily integrity, and medical choice because she must be vaccinated or submit to a COVID-19 test whenever she wishes to "attend restaurants, bars, get a haircut, or stay in a hotel or Airbnb, among other activities." ECF No. 35 at 32.

### D. René Matos Ruíz

Plaintiff René Matos Ruíz is a resident of San Germán, Puerto Rico, but works as a warehouse assistant and shelf attendant for Econo Supermarkets in Mayagüez, Puerto Rico. Mr. Matos is not currently vaccinated for COVID-19 and is opposed to vaccinations "based on [his] religious beliefs and convictions, and also [his] knowledge and the searches that I

conducted of the ingredients and compounds in the product." Hearing, Dec. 7, at 3:16–3:17 PM.[4]

Consequently, Mr. Matos, a 58-year-old man, has not been vaccinated since he was a child.

However, Econo Supermarkets requires Mr. Matos to renew his health certificate annually in

order to work. Despite not being vaccinated, Mr. Matos currently possesses a health certificate

and is working. Mr. Matos hurried to renew his certificate on August 6, 2021, the day after

Regulation 138-A was issued, fearing that he would be denied a health certificate because of his

non-vaccinated status. Despite not having proof of COVID-19 vaccination, Mr. Matos was

granted a health certificate. Mr. Matos is concerned that by the next time he must renew his

health certificate, in August 2022, he will be denied a certificate because he is not vaccinated,

and he will therefore lose his job.

Mr. Matos is not required to be vaccinated by Econo Supermarkets as long as he gets a

weekly COVID-19 test. It is Mr. Matos' opinion that Econo Supermarkets' requirement is a

result of the mandates because "they have mentioned that" their policy is in compliance with the

law. Hearing, Dec. 7 at 5:10 PM. Accordingly, Mr. Matos and his supervisor reached a verbal

agreement whereby Mr. Matos will be given Thursdays off, during which he can complete his

weekly COVID-19 test.

Mr. Matos also explained the impact that EO75 has had on his personal life. He described

how not having a vaccine card has meant that he will be turned away from certain restaurants

and he has had difficulty attending even public festivals such as those held by the local

community in San Germán. He also testified that fixing his day off on a Thursday takes him out

---

[4] Mr. Matos's religious basis for objecting to vaccination is unclear, and he does not join Ms. Vega's RFRA claim or bring his own. When asked about the specifics of his religious convictions, Mr. Matos responded that he did not belong to any organized religion, nor does he have any religious preference. On cross examination he listed his three religious convictions: "Number one: I believe in God. Number two: I believe in preserving your . . . sound and healthy body. Number three: Obeying the Word." Hearing, Dec. 7, at 4:52–4:53 PM. However, Mr. Matos acknowledged that vaccination does not go against any religious "dogma" that he holds. Hearing, Dec. 7 at 5:15 PM.

of the normal rotation of days, and he would prefer to have his vacation days return to a normal

rotation. He would also prefer not to interrupt one of his days off to be tested.

    For the above reasons, Mr. Matos claims that Regulation 138-A deprives him of his right

to earn an honest living and threatens his property interest in his health certificate without

sufficient justification for restricting or infringing upon those rights. ECF No. 35 at 31.

Mr. Matos also claims that the EO75 burdens his constitutional rights to privacy, personal

autonomy, bodily integrity, and medical choice because he must either be vaccinated or submit

to COVID-19 testing whenever he wants to go to "restaurants, bars, get a haircut, stay in a hotel

or Air[bnb], among other activities." ECF No. 35 at 32.

## IV.    DISCUSSION

    "A preliminary injunction is an extraordinary and drastic remedy, one that should not be

granted unless the movant, *by a clear showing*, carries the burden of persuasion." Mazurek v.

Armstrong, 520 U.S. 968, 972 (1997) (citation omitted) (emphasis in original). The movant bears

the burden of persuading the district court that the following four elements are satisfied: "(1) a

likelihood of success on the merits, (2) a likelihood of irreparable harm absent interim relief, (3)

a balance of equities in the plaintiff's favor, and (4) service of the public interest." Arborjet, Inc.

v. Rainbow Treecare Sci. Advancements, Inc., 794 F.3d 168, 171 (1st Cir. 2015). Here,

Plaintiffs, as the movants seeking injunctive relief, bear the burden of establishing that the above

factors weigh in their favor.

    The first two factors in the preliminary injunction analysis are the most important—

likelihood of success and irreparable harm. Charlesbank Equity Fund II v. Blinds To Go, Inc.,

370 F.3d 151, 162 (1st Cir. 2004). Regarding likelihood of success, "the district court is required

only to make an estimation of likelihood of success and 'need not predict the eventual outcome

on the merits with absolute assurance.'" <u>Corp. Techs., Inc. v. Harnett</u>, 731 F.3d 6, 10 (1st Cir. 2013) (quoting <u>Ross-Simons of Warwick, Inc. v. Baccarat, Inc.</u>, 102 F.3d 12, 16 (1st Cir. 1996)). If the moving party fails to show it is likely to succeed on the merits, a court may act within its discretion to deny relief without addressing the remaining three factors. <u>New Comm. Wireless Servs.</u>, 287 F.3d at 9. Therefore, "[l]ikelihood of success is the main bearing wall of the four-factor framework." <u>Ross–Simons</u>, 102 F.3d at 16.

Nevertheless, "[h]ow strong a claim on the merits is enough depends on the balance of the harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." <u>Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.</u>, 582 F.3d 721, 725 (7th Cir. 2009). "The burden of demonstrating that a denial of interim relief is likely to cause irreparable harm rests squarely upon the movant" and the potential for irreparable injury "must not be assumed, it must be demonstrated . . . ." <u>Charlesbank Equity Fund II</u>, 370 F.3d at 162; <u>Narragansett Indian Tribe v. Guilbert</u>, 934 F.2d 4, 5 (1st Cir. 1991). Like the required showing of the likelihood of success, "the measure of irreparable harm is not a rigid one; it has been referred to as a sliding scale, working in conjunction with a moving party's likelihood of success on the merits." <u>Vaquería Tres Monjitas, Inc. v. Irizarry</u>, 587 F.3d 464, 485 (1st Cir. 2009) (citations omitted).

### A. Likelihood of Success on the Merits

#### a. Standing

Under Article III of the United States Constitution, the jurisdiction of Federal Courts is limited to "Cases" and "Controversies." <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 559 (1992). This so being, as a threshold matter, federal courts must be satisfied that a plaintiff is the correct person to bring the case at bar by possessing the requisite constitutional standing. <u>Id</u>. at

560. Neither the Supreme Court nor the First Circuit has yet clarified what burden a plaintiff carries to demonstrate standing at the preliminary injunction stage; however, "several circuit courts have held that the 'merits' on which plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction, including standing." Pietrangelo v. Sununu, 2021 WL 1254560 (D.N.H. Apr. 5, 2021) (citing Waskul v. Washtenaw Cnty. Cmty. Mental Health, 900 F.3d 250, 256 n.4 (6th Cir. 2018); Yazzie v. Hobbs, 977 F.3d 964, 966 (9th Cir. 2020)) (internal quotations omitted). "This is so because an affirmative burden of showing a likelihood of success on the merits . . . necessarily includes a likelihood of the court's reaching the merits, which in turn depends on a likelihood that plaintiff has standing." Pietrangelo, 2021 WL 1254560 (D.N.H. Apr. 5, 2021) (citing Waskul, 900 F.3d at 256 n. 4) (internal quotations omitted). Therefore, plaintiffs who fail to affirmatively produce evidence showing they possess a "substantial likelihood of standing" should not be granted a preliminary injunction on those claims. Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 913 (D.C. Cir. 2015); New York v. United States Dep't of Homeland Sec., 969 F.3d 42, 59 (2d Cir. 2020). On specific claims discussed below, Plaintiffs have failed to show a substantial likelihood that they possess standing to pursue those claims, which weighs against their likelihood of success on the merits.

### 1. Ms. Vega's Standing for Her Economic Liberty and Property Rights Claim

Ms. Vega asserts that the vaccine or COVID-19 test check requirements to which her Airbnb is subject deprives her of her right to earn an honest living, in violation of her economic liberty and property rights. ECF No. 35 at 32. With regards to claims such as this one, the Supreme Court has enacted a three-part test for standing. First, the plaintiff must have suffered an injury in fact that is (1) concrete and particularized and (2) actual, imminent, and not

conjectural or hypothetical. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). Second, there must exist a causal connection between the injury and the complained conduct; the injury being fairly traceable to the challenged action of the defendant. Id. Third, it must be likely and not speculative that the injury will be redressed by a favorable decision by the court. Id. at 561.

Turning now to the circumstances of Ms. Vega's business, Hillside Cabin is still operating at twenty nights per month. Because Ms. Vega has operated Hillside Cabin for less than a year, she was unable to testify as to Hillside Cabin's "normal" capacity, only noting that for several months before the mandates, Hillside Cabin was completely booked. Likewise, she could not testify as to whether a decrease in her occupancy—if any—could be attributed to normal seasonality, initial novelty of her business, or other factors besides the mandates. More importantly, the mandates may not be having any impact at all on Hillside Cabin's occupancy because Ms. Vega did not state in her testimony whether she, as owner of Hillside Cabin, was even complying with EO75. Instead, when asked whether she was asking her guests for proof of vaccination she invoked her Fifth Amendment right to remain silent.[5] If Ms. Vega is not following the requirements of EO75, then EO75 cannot be inflicting any actual, concrete, and particularized harm to her business, and her alleged harm is therefore conjectural, speculative, and does not constitute injury in fact. Accordingly, Ms. Vega produced no evidence to demonstrate a substantial likelihood of standing to bring her economic liberty and property rights claim because she produced no evidence of either an actual, concrete, or particularized harm, nor did she show a causal connection between the mandate and her harm.

---

[5] Ms. Vega invoking her constitutional right under the Fifth Amendment is not being held against her. Nor is the court taking her silence as evidence that she is not complying with EO75's mandate. Instead, because a movant bears the burden of convincing the court that they merit the extraordinary remedy of a preliminary injunction, Ms. Vega has the burden of showing she was actually harmed by the mandate she challenges to establish standing. But by refusing to provide that evidence, Ms. Vega has failed in her burden to show a substantial likelihood of standing on her economic liberty and property rights claim.

## 2. Ripeness of Mr. Matos' Property Right Claim

Mr. Matos also argues that Regulation 138-A deprives him of his right to earn an honest living and threatens his property interest in his health certificate which he needs to continue working in his current position. ECF No. 35 at 31. However, Mr. Matos' harm to his property interest in his health certificate is not ripe for adjudication. For a claim to be ripe, two factors must be present: (1) the hardship to the parties of withholding court consideration, and (2) the fitness of the issues for judicial decision. Doe v. Bush, 323 F.3d 133, 138 (1st Cir. 2003). The hardship prong examines whether a plaintiff "is suffering any present injury from a future contemplated event." McInnis-Misenor v. Maine Med. Cntr., 319 F.3d 63, 70 (1st Cir. 2003). The fitness prong depends on "[t]he baseline question [of] whether allowing more time for development of events would significantly advance our ability to deal with the legal issues presented [or] aid us in their resolution." Bush, 323 F.3d at 138–39. Namely, an issue is not fit if many important questions remained unanswered and if the court will have to "pile one hypothesis on top of another" and assume that a certain future state of affairs will come to pass. See id. at 139.

Both prongs weigh against a finding that Mr. Matos' claimed property interest in his health certificate is ripe.[6] Withholding consideration of Mr. Matos' claim results in only minor hardship for Mr. Matos. Mr. Matos currently has a health certificate which he secured shortly after Regulation 138-A was promulgated in August 2021. Therefore, although he fears that his certificate may not be renewed in August 2022, he suffers no present injury regarding his employment because he currently holds a health certificate, and he continues to work.

---

[6] The court withholds judgment on the legal question of whether Mr. Matos has a property right in his health certificate. Even if Mr. Matos does have a property interest in his health certificate, his claim is not ripe.

Turning to the second prong, it is not even clear that Mr. Matos will ever lose his health certificate, and it is not a given that he will be denied a certificate in the future. For the court to conclude that Mr. Matos will be unable to renew his health certificate requires the assumption that the Puerto Rico government will still require COVID-19 vaccination as a requisite for obtaining a health certificate in August 2022. That assumption also requires the hypothesis that the COVID-19 pandemic and pandemic related restrictions will not improve before August 2022. Therefore, resolution of this issue is not fit because only more time will allow for the development of events that would significantly advance the court's ability to deal with the legal issues presented. In sum, Mr. Matos' fails to show a substantial likelihood of ripeness for his claimed for violation of his property right in his health certificate.[7]

> **b. Whether EO 75 and Regulation 138-A Violate Plaintiffs' Substantive Due Process Rights**

Turning now to specifics of Plaintiffs' remaining claims, for the last century federal courts have developed and applied a detailed hierarchy of scrutiny when analyzing government action which allegedly led to violations to constitutional rights—rational basis scrutiny, intermediate scrutiny, and strict scrutiny being the most commonly invoked. County of Butler v. Wolf, 486 F. Supp. 3d 883 (W.D. Penn. 2020). Substantive due process challenges to vaccine mandates and COVID-19 measures have been analyzed by many courts under the scrutiny standard established by Jacobson v. Massachusetts, 197 U.S. 11 (1905). Many courts have interpreted Jacobson, a one-hundred-and-fifteen-year-old case that predates the tiers of scrutiny, to establish an extremely deferential standard toward government action during public health

---

[7] Ms. Llenza also charges that Regulation 138-A prevents her from obtaining a health certificate. ECF No. 35 at 29–30. In contrast to Mr. Matos, Ms. Llenza does not currently have a health certificate, and she therefore cannot claim to have a property interest in something she does not yet have. Accordingly, any asserted property interest by Ms. Llenza is also unripe.

emergencies, effectively requiring that government action during a pandemic always be analyzed under something akin to or lower than rational basis review. See e.g. Bimber's Delwood, Inc. v. James, 496 F. Supp. 3d 760, 774 (W.D.N.Y. Oct. 21, 2020) ("Indeed, the overwhelming majority of courts resolving constitutional challenges to COVID-19-related measures employ Jacobson."); League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer, 814 F. App'x 125 at 127–28 (6th Cir. 2020) ("[T]he police power retained by the states empowers state officials to address pandemics such as COVID-19 largely without interference from the courts"); see also County of Butler, 486 F. Supp. 3d at 896 ("Defendants argue that no matter which traditional level of scrutiny that the underlying constitutional violation would normally require, a more deferential standard is appropriate.").

Of course, because Jacobson predates the tiers of scrutiny, the words "rational basis" are never used in the opinion, and its holding has been subject to qualification and debate ever since. Accordingly, Plaintiffs argue that their claims should not be scrutinized under Jacobson, but rather that the court should apply "heightened constitutional scrutiny," particularly in regard to Plaintiffs' claimed violations of "personal . . . autonomy, bodily integrity, and medical choice." ECF No. 7 at 6–7. Defendants urge the court to apply the deferential Jacobson rational basis standard in this case, thereby preserving the executive orders and regulations under the Puerto Rico government's "broad police powers." ECF No. 20 at 4–5.

In Jacobson, the Supreme Court analyzed a claim by plaintiff Henning Jacobson when he challenged a state law which required him to submit to a smallpox vaccination during an ongoing smallpox pandemic, or else pay a $5 fine or establish that he was exempt. Jacobson, 197 U.S. at 12–14. The Supreme Court held that "the police power of a state must be held to embrace, at least, such reasonable regulations established directly by legislative enactments as will protect

the public health and the public safety." Jacobson, 197 U.S. at 25; see also Zucht v. King, 260

U.S. 174, 176 (1922) ("Jacobson v. Massachusetts . . . . had settled that it is within the police

power of a state to provide for compulsory vaccination."). In finding that states may properly

exercise the police power to address a pandemic, the Jacobson Court stated what is normally

described as the "Jacobson standard," which approximates rational basis review: Courts may

only "review," "adjudge" and "thereby give effect to the Constitution" with regard to

government measures involving a public health emergency such as a pandemic if the measures

"purporting to have been enacted to protect the public health, the public morals, or the public

safety, [have] no real or substantial relation to those objects"[8] or if the government action "is

beyond all question, a plain, palpable invasion of rights secured by the fundamental law"

Jacobson, 197 U.S. at 31.

        "Fundamental" rights or liberties are those protected by the Due Process Clause and

include "most of the rights enumerated in the Bill of Rights . . . [I]n addition these liberties

extend to certain personal choices central to individual dignity and autonomy, including intimate

choices that define personal identity and beliefs." Obergefell v. Hodges, 576 U.S. 644, 663

(2015). Fundamental rights and liberties are "objectively deeply rooted in this nation's history

and tradition" so that "neither liberty nor justice would exist if they were sacrificed."

Washington v. Glucksberg, 521 U.S. 702, 720-21 (1997). These fundamental rights include "the

right to marry," "to have children," "to direct the education and upbringing of one's children,"

"to marital privacy," "to use contraception," "to bodily integrity," and "to abortion . . . ." Id. at

721. In a substantive due process challenge, a plaintiff must provide a "careful description" of

the asserted fundamental liberty interest. Id.

---

[8] Plaintiffs make no allegation, nor did they produce any evidence, that the challenged measures put in place by the
Puerto Rico government have no real or substantial relation to public health.

Accordingly, Jacobson does not give free license to a government to trample on any

constitutional right during a pandemic; instead, any such abrogation must examine the right at

issue and whether a fundamental right is involved. In Roman Catholic Diocese v. Cuomo, the

Supreme Court found that a COVID-19 regulation in New York that targeted houses of worship

was subject to "strict scrutiny," because the regulations were an abrogation of the Free Exercise

Clause of the First Amendment and were not religiously "neutral" and of "general applicability."

Roman Catholic Diocese v. Cuomo, 141 S. Ct. 63, 67 (2020). Therefore, the New York

restriction must have been narrowly tailored to serve a compelling state interest.

In his concurrence in Cuomo, Justice Neil Gorsuch went on to explain that the Supreme

Court in Jacobson "essentially applied rational basis review to Henning Jacobson's

challenge . . . ." because the right Jacobson asserted was different than the right the plaintiffs

raised in Cuomo. Cuomo, 141 S. Ct. at 70 (Gorsuch, J., concurring). Unlike the plaintiffs in

Cuomo, who invoked the Free Exercise right under the First Amendment, Jacobson had raised "a

substantive due process right to bodily integrity that emanated from the Fourteenth Amendment .

. ." Cuomo, 141 S. Ct. at 70 (Gorsuch, J., concurring) (internal citations omitted). Justice

Gorsuch explained that

> "Rational basis review is the test this Court *normally* applies to Fourteenth
> Amendment challenges, so long as they do not involve suspect classifications
> based on race or some other ground, or a claim of fundamental right. Put
> differently, Jacobson didn't seek to depart from normal legal rules during a
> pandemic, and it supplies no precedent for doing so. Instead, Jacobson applied
> what would become the traditional legal test associated with the right at issue—
> exactly what the Court does today . . ."

Cuomo, 141 S. Ct. at 70 (Gorsuch, J., concurring) (emphasis in original). Therefore, the

holding in Cuomo was consistent with Jacobson because the court applied the correct standard

for the right in question: strict scrutiny was the correct standard because the restrictions in New

York were a plain, palpable invasion of the fundamental right secured by the First Amendment

Free Exercise Clause, while the right Jacobson raised was not a fundamental right. See also

Klassen v. Trustees of Indiana Univ., 2021 WL 3073926 at *21 (N.D. Ind. July 18, 2021) ("This

view remains consistent with the right at stake in Jacobson: though a true "liberty" proved at

stake—the right to refuse a vaccine during a smallpox epidemic . . . wasn't fundamental under

the Constitution to require greater scrutiny than rational basis review").

Justice Gorsuch lamented that courts have mistakenly interpreted Jacobson for "towering

authority that overshadows the Constitution during a pandemic[.]" Cuomo, 141 S. Ct. at 71;[9] see

also Klassen, 2021 WL 3073926 at *21 ("Jacobson didn't hold that the government's authority in

a pandemic balloons for it do whatever it wants in the name of public safety.") Indeed, the

Jacobson Court itself explained that public health measures during a pandemic may not always

be constitutional. The Jacobson Court cautioned,

> it might be that an acknowledged power of a local community to protect itself
> against an epidemic threatening the safety of all might be exercised in particular
> circumstances and in reference to particular persons in such an arbitrary,
> unreasonable manner, or might go so far beyond what was reasonably required for
> the safety of the public, as to authorize or compel the courts to interfere for the
> protection of such persons.

Jacobson, 197 U.S. at 28. The Court went on and explained,

> Before closing this opinion we deem it appropriate, in order to prevent
> misapprehension as to our views, to observe—perhaps to repeat a thought already
> sufficiently expressed, namely— that the police power of a state, whether
> exercised directly by the legislature, or by a local body acting under its authority,
> may be exerted in such circumstances, or by regulations so arbitrary and
> oppressive in particular cases, as to justify the interference of the courts to prevent
> wrong and oppression."

---

[9] Justice Gorsuch went on to write "In the end, I can only surmise that much of the answer lies in a particular
judicial impulse to stay out of the way in times of crisis. But if that impulse may be understandable or even
admirable in other circumstances, we may not shelter in place when the Constitution is under attack." Roman
Catholic Diocese, 141 S. Ct. at 71.

Jacobson, 197 U.S. at 38.

In sum, Jacobson does not function as a rubber stamp for government action during a pandemic; rather, the standard of scrutiny depends on the right being asserted. See Cuomo, 141 S. Ct. at 68 ("But even in a pandemic, the Constitution cannot be put away and forgotten. The restrictions at issue here, by effectively barring many from attending religious services, strike at the very heart of the First Amendment's guarantee of religious liberty."). The First Circuit likewise recognized that Jacobson does not remove every right from the normal standards of scrutiny during a pandemic. See Does 1-6 v. Mills, 16 F.4th 20, 29 (1st Cir. 2021) (recognizing in dicta that during the context of the COVID-19 pandemic a law that is not religiously neutral or of general applicability will be subject to strict scrutiny).

Plaintiffs' claims should be closely analyzed based on the right being asserted, whether the claim rises to a fundamental right or whether the asserted liberty interest only merits rational basis review. To show a likelihood of succeeding on the merits, plaintiffs must show that the government action cannot survive the requisite scrutiny associated with the asserted right or must convince the court that the government acted in an arbitrary, oppressive, unreasonable manner, going far beyond what was reasonably required for the safety of the public. Jacobson, 197 U.S. at 28, 31.

1. **Personal Autonomy, Bodily Integrity, and Medical Decision-making Claims**

Turning now to the rights at issue, Plaintiffs Ms. Vega, Ms. Llenza, and Mr. Matos claim that the requirement for vaccine or COVID-19 test checks in public places under EO75 violates their constitutional rights to personal autonomy, bodily integrity, and medical choice under the Fourteenth Amendment because they must either be vaccinated or submit to a COVID-19 test

whenever they wish to "attend restaurants, bars, get a haircut, or stay in a hotel or Airbnb, among other activities." ECF No. 35 at 32.

The Supreme Court has unquestionably recognized a liberty interest in the right to "bodily integrity," and that the Due Process Clause protects the traditional right to refuse unwanted lifesaving medical treatment. Glucksberg, 521 U.S. at 720 citing (Cruzan v. Dir., Missouri Dep't of Health, 497 U.S. 261, 278–79 (1990)). However, since Jacobson, the Supreme Court has not identified the right to refuse vaccination as implicating a fundamental right meriting any more scrutiny than rational basis. See Cuomo, 141 S. Ct. at 70.

The Supreme Court is "reluctant to expand the concept of substantive due process" to specific liberties in part because "[b]y extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We must therefore exercise the utmost care whenever we are asked to break new ground in this field . . . ." Glucksberg, 521 U.S. at 721 (internal quotations omitted).

The right to refuse a vaccine, although implicating an interest in bodily autonomy protected by the Constitution, does not constitute a fundamental right that would require greater scrutiny than the low standard set by Jacobson. Klassen, 2021 WL 3073926 at *21. Therefore, although Plaintiffs have a right to bodily integrity, consistent with the precepts of Glucksberg, Jacobson, and Cuomo, the right to refuse vaccination does not implicate a fundamental right of bodily integrity which merits higher scrutiny than rational basis. Klassen v. Trustees of Indiana University, 7 F.4th 592, 593 (7th Cir. 2021) ("[T]here can't be a constitutional problem with vaccination against SARS-CoV-2").

If vaccination against COVID-19 does not violate a fundamental right to bodily integrity and medical choice, then the alternatives under EO75 also do not rise to the level of fundamental

violations. See id. ("These plaintiffs just need to wear masks and be tested, requirements that are not constitutionally problematic."). If vaccination, as the permanent injection of a foreign substance into the patient's body, does not implicate a right to bodily integrity and medical choice, then certainly the temporary insertion of a swab into a patient's nose does not either. In fact, Plaintiffs Llenza and Matos do not object to COVID-19 tests as strongly as they do to vaccination, because although both Plaintiffs refuse to be vaccinated, they both testified that they regularly submit to free COVID-19 tests. Only Plaintiff Ms. Vega objects to the tests on uncertain religious grounds that will be discussed below. In sum, to withstand Plaintiffs' challenges based on bodily autonomy and medical choice, the vaccine check and COVID-19 test result checks under EO75 must merely survive rational basis review.

### 2.  Privacy Rights Claims

Second, Plaintiffs Ms. Vega, Ms. Llenza, and Mr. Matos further claim that being required to show proof of vaccination or a COVID-19 test violates their constitutionally protected medical privacy rights. ECF No. 35 at 32. Ms. Vega additionally claims, alongside Tropical Chill, that EO75 unconstitutionally requires those Plaintiffs to violate the constitutional privacy rights of their customers when they ask for proof of vaccination or a negative COVID-19 test. ECF No. 35 at 32.

"The privacy interest in medical information is neither fundamental nor absolute." United States v. Kravetz, 706 F.3d 47, 64 (1st Cir. 2013) (citing Whalen v. Roe, 429 U.S. 589, 878 (1977)). In fact, under normal circumstances, requiring disclosures of medical information "to representatives of the State having responsibility for the health of the community, does not automatically amount to an impermissible invasion of privacy." Whalen, 429 U.S. at 878. Because medical privacy rights are not "fundamental," government action infringing on those

rights during a pandemic should fall squarely within the rational basis review normally required and demanded by Jacobson. Klassen, 2021 WL 3073926 at *16 ("If the government infringes on a fundamental right, the court often applies strict scrutiny . . . Whereas infringements on other rights or liberties, though still constitutionally scrutinized, must meet what courts call rational basis review.") (citing Glucksberg, 521 U.S. at 722; Sweeney v. Pence, 767 F.3d 664, 668 (7th Cir. 2014)).

### 3. Economic Liberty and Property Rights Claims

Finally, Plaintiffs bring economic liberty and property rights claims. In particular, Plaintiffs Tropical Chill and Ms. Vega argue that the requirements under EO75 that they ask for proof of vaccination or a negative COVID-19 test—or for Tropical Chill, to operate at 50 percent capacity—infringes upon their right to earn a living and use their property as they see fit. ECF No. 35 at 32. Ms. Llenza also argues that the vaccination requirements under EO75 and Regulation 138-A infringe upon her ability to obtain employment in the fields for which she has been trained, in violation of her economic liberty rights. ECF No. 35 at 29–30.

It has long been held that "the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure." Truax v. Raich, 239 U.S. 33, 41 (1915). However, economic liberty and property rights claims do not rise to the level of fundamental rights warranting heightened scrutiny because the Supreme court has "held for many years (logically or not) that the 'liberties' protected by substantive due process do not include economic liberties." Stop the Beach Renourishment, Inc. v. Florida Dept. of Environmental Protection, 560 U.S. 702, 721 (2010). This is not to say that these interests are not constitutionally protected; however, judicial review only scrutinizes infringements of these rights under rational basis review. See

United States v. Carolene Products, 304 U.S. 144, 153 (1938) (Applying rational basis scrutiny to "regulatory legislation affecting ordinary commercial transactions.")

Additionally, "[t]he right to hold private employment and to pursue one's chosen profession free from unreasonable government interference is encapsulated in the liberty concept of the Due Process Clause. Mead v. Independence Ass'n, 684 F.3d 226, 232 (1st Cir. 2012). However, the First Circuit has noted that this right is usually "implicated only by government interference that is direct and unambiguous, as when a city official demands that a restaurant fire its bartender, . . . or a state agency explicitly threatens to prosecute a private company's clients if they continue to contract with the company." Id. Substantive due process challenges based on the right to work in a chosen profession are therefore properly analyzed under the rational basis standard that applies to economic liberties. County of Butler, 486 F. Supp. 3d at 920–21 ("[C]ourts generally treat government action purportedly violating the right to pursue an occupation in the same light as economic legislation and use the general standard of review applied to substantive due process claims . . . Substantive due process challenges to a legislative act are reviewed under the rational basis test."). Therefore, EO75 and Regulation 138-A, as challenged by Plaintiffs economic liberty and property rights claims, should also be analyzed under rational basis scrutiny.

### 4.   Whether the Mandates Withstand the Requisite Scrutiny under Jacobson

Insofar as EO75 and Regulation 138-A do infringe on Plaintiffs' substantive due process rights, to demonstrate a substantial likelihood of success the Plaintiffs bear the burden of showing that the mandates are not rationally related to a legitimate government interest or that the government acted in an arbitrary, oppressive, unreasonable manner, going far beyond what was reasonably required for the safety of the public. Jacobson, 197 U.S. at 28, 31; Medeiros v.

Vincent, 431 F.3d 25, 29 (1st Cir. 2005) ("Legislation or regulation which neither employs a suspect classification nor impairs fundamental rights, will survive constitutional scrutiny, provided the remedy is "rationally related" to a legitimate governmental purpose.").

The Supreme Court has clearly stated that "[s]temming the spread of COVID-19 is unquestionably a compelling state interest . . . ." Cuomo, 141 S. Ct. at 67. Likewise, the First Circuit has declared: "Few interests are more compelling than protecting public health against a deadly virus." Does 1-6 v. Mills, 16 F.4th 20, 32 (1st Cir. 2021). That the government has a "compelling interest" constitutes a high enough interest for strict scrutiny, and therefore, certainly high enough for rational basis. The only remaining question is whether EO75 and Regulation 138-A are "rationally related" to that compelling government interest or whether the government acted in an arbitrary, oppressive, unreasonable manner, going far beyond what was reasonably required.

In this analysis, it is of paramount importance that courts refrain from policymaking, principally because the Constitution "entrusts the safety and the health of the people to the politically accountable officials of the States." S. Bay United Pentecostal Church, 140 S. Ct. 1613 (2020) (Roberts, C. J., concurring). Furthermore, courts "should respect the judgment of those with special expertise and responsibility in this area." Cuomo, 141 S. Ct. at 68. Therefore, "[i]t is no part of the function of a court or a jury to determine which one of two modes was likely to be the most effective for the protection of the public against disease." Jacobson, 197 U.S. at 30. Courts must not therefore subject public health mandates "to second-guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health and is not accountable to the people." S. Bay United Pentecostal Church, 140 S. Ct. at 1613–14 (Roberts, C. J., concurring).

Based on the arguments of the parties, relevant sources of authority, documentary evidence, and testimony of the witnesses at the preliminary injunction hearing, both Regulation 138-A and EO75 are rationally related to a legitimate government interest and were not enacted with a degree of arbitrariness, oppression, and unreasonableness that far exceeds what was required for the public's safety.

### i.    Executive Order 75 Vaccination Check Requirement for Businesses

Plaintiffs challenge EO75 and its mandate that private businesses require COVID-19 vaccination or weekly tests for individuals working in the private sector, such as Mr. Matos who works for a supermarket, and Ms. Llenza, who is seeking employment in sectors which would require weekly testing. ECF No. 35 at 29–30, 31. Plaintiffs argue that getting the tests on a weekly basis is prohibitively costly and extremely burdensome. ECF No. 7 at 11–12. However, the evidence presented at the hearing is not as definitive. Both Mr. Matos and Ms. Llenza have almost always been able to secure free testing requiring only a few hours of time-investment each week.

Mr. Matos reached a verbal agreement with his employer whereby he will get Thursdays off to complete his COVID-19 testing rather than becoming vaccinated. Mr. Matos travels to Cabo Rojo to be tested, which requires him to drive approximately 20 minutes both ways. Once in Cabo Rojo, Mr. Matos will get tested either at the government "tracing center" or he will coordinate an electronic drive-through appointment at the local Walgreens Pharmacy. Neither option is particularly convenient for Mr. Matos. When Mr. Matos goes to be tested at the tracing center, he usually must wait in line for as long as one to two hours to be tested. Plaintiffs introduced photos that Mr. Matos took on various dates demonstrating the length of the line at the Cabo Rojo tracing center, and the outdoor line can be seen to extend for what appears to be

several storefronts. Exhibits 32–38. Mr. Matos also explained that the Cabo Rojo tracing center sometimes runs out of tests before all can be attended.

Mr. Matos' alternative to the testing center is the Cabo Rojo Walgreens. Mr. Matos explained that Walgreens requires him to coordinate a test appointment online which is then completed through the drive through window. Upon arrival, he sometimes must wait for 20 minutes to an hour to be served. While this process is easier than that offered at the tracing center, Mr. Matos explained that because of a quirk in Walgreens' online system, he cannot schedule consecutive tests on Thursday—his day off—because the system only allows for one free test per seven days. If one week Mr. Matos is tested at Walgreens Pharmacy on a Thursday, he can only schedule the next test for the following Friday and so is unable to schedule a free test on his next Thursday off. By getting tested in Cabo Rojo, either at the tracing center or at Walgreens, Mr. Matos testified that it takes between 2 and 2.5 hours to drive, park, wait in line, get tested, and return home. When asked, Mr. Matos characterized the testing regime neither as a mere inconvenience nor as a burden, but as "torture." Hearing, Dec. 7, at 5:19 PM.

Mr. Matos explained that he gets tested either at the Cabo Rojo tracing center or at Walgreens for reasons of cost. If he is tested only once a week at either the tracing center or at Walgreens, the tests are free for Mr. Matos. However, Mr. Matos also explained that if he cannot secure a test during the required time, he must get a test at a private lab which costs him $45. Mr. Matos's job pays him $8 an hour, and he does not have medical insurance. Therefore, Mr. Matos said he has only paid for a private test once after an outbreak occurred at work. Regularly using a private lab for weekly tests would be too onerous for Mr. Matos' limited income. Nevertheless, Mr. Matos has declined to request the health insurance plan offered by the government of Puerto Rico—Plan Vital.

31

Similarly, Ms. Llenza has so far been able to obtain free testing when required rather than getting vaccinated. Ms. Llenza reported that she tries to avoid the test taken using a nose swab because her eye had bled once after a rough nose test. She therefore goes to a lab in Carolina, Puerto Rico, that collects saliva tests. To arrive at the lab, Ms. Llenza must leave early in the morning, drive 25 to 30 minutes, and then drive home for an hour in rush-hour traffic. Ms. Llenza has only been tested in the lab in Carolina and testing there is free for her through her health insurance plan. Ms. Llenza testified that she became aware that free tests were also available at Walgreens through word of mouth, and that the government was offering free tests after she called a number associated with a Facebook ad posted by the Department of Health. Ms. Llenza also described how she once attempted to get a test done at one of the free government testing sites but that she was unable to have the test done because she arrived too late. To her knowledge, the government test sites usually operate one day a week from 8:00 AM to 1:00 PM, function on a first-come-first-served basis, and that they sometimes run out of tests before everyone in line can be tested. She has not used the free tests available at the Walgreens Pharmacy chain because she has found the process for setting up a drive-through appointment too tedious.

As discussed above, the Puerto Rico government has a rational basis in requiring testing for people who work in industries like Mr. Matos and for the fields in which Ms. Llenza has training. Plaintiffs certainly describe a process that is inconvenient as a weekly undertaking. However, contrary to Plaintiffs' assertions, in all but one instance, both Mr. Matos and Ms. Llenza have been able to be tested for free. They have also been able to travel relatively short distances to local testing centers with a time investment of roughly three hours. Such processes are not oppressive, and certainly not torturous as Mr. Matos testified.

ii.     **Executive Order 75 Vaccination Check Requirements**

Plaintiffs argue that placing restrictions on unvaccinated persons' ability to frequent restaurants and other places covered by EO75 cannot be justified because "vaccinated people can get and spread infection []just like vaccinated people." ECF No. 7 at 17. They argue that the restrictions affecting their liberty interests were arbitrary, oppressive, and unreasonable, going far beyond what is reasonably required for the safety of the public because "the Puerto Rico[ ] health care system has never been in real jeopardy of being overwhelmed even during the worst part of the pandemic" and "as more people get vaccinated, the share of cases, hospitalizations, and deaths represented by unvaccinated people will tend to fall . . ." ECF No. 7 at 19. Therefore, Plaintiffs conclude that requiring Plaintiffs like Tropical Chill and Ms. Vega to check vaccination and COVID-19 test status is "irrational and arbitrary." ECF No. 35 at 12.

Plaintiffs contend that unvaccinated and vaccinated persons transmit COVID-19 equally because the viral load of vaccinated and unvaccinated people infected with COVID-19 is similar and "viral load is the most significant factor" in the ability for a person to infect. ECF No. 7 at 15. During the evidentiary hearing, Plaintiffs introduced the testimony of Dr. María E. Carrascal Muñoz, an expert in immunology and infectious diseases, who stated that in her clinical experience both vaccinated and unvaccinated persons who contract the COVID-19 virus will transmit it equally if they are symptomatic. Hearing Dec. 8, at 11:54 PM; ECF No. 80 at 1.

However, Dr. Carrascal's testimony conflicted in part with that of Plaintiffs' expert in epidemiology, Dr. Andrew Bostom. ECF No. 76 at 1. Dr. Bostom testified that persons who have been vaccinated may have a short period of time at peak vaccination where their ability to spread the COVID-19 virus may be less than an unvaccinated person, and that in randomized control trials vaccinated persons also got fewer infections. Both Doctors Carrascal and Bostom referred

to a study comparing how vaccinated and unvaccinated persons transmitted the COVID-19 virus in prison. Exhibit 52. Nevertheless, the utility of the study for society as a whole is questionable because, as Dr. Carrascal explained, it examined "a contained place that is closed and the people are very together, like in a prison." Hearing Dec. 8, at 11:54 PM.

During their presentation of the evidence, Dr. Iris Cardona Gerena testified as an expert in public health, immunizations, infectious diseases, vaccine preventable diseases, and pediatry. ECF No. 82 at 1. Dr. Cardona confirmed that for the first four days of infection by the COVID-19 virus, persons who are unvaccinated and vaccinated both have the same viral load. However, she clarified that after the first four days, the viral load decreases faster in vaccinated individuals, which means that the unvaccinated can transmit the virus for a longer period of time. On this same point, Defendants also introduced the testimony of Dr. Melissa Marzán Rodríguez who was admitted as an expert in epidemiology and public health. ECF No. 84 at 1. Dr. Marzán confirmed on cross examination that viral load is the most important factor in transmitting the COVID-19 virus, but that the viral load in vaccinated people decreases more quickly than those who are not vaccinated.

In terms of risk of contracting COVID-19, Defendants introduced data compiled by Dr. Marzán which showed that unvaccinated persons were 2.49 times more likely to contract COVID-19 than an unvaccinated person in August 2021—at the height of the Delta variant spike. Exhibit D, at 1. The same data showed that an unvaccinated person was 5.72 times more likely to be hospitalized from COVID-19 in August 2021, and 7.02 times more likely to die from COVID-19. Exhibit D, at 2–3. Finally, Defendants presented the testimony of Dr. Rafael Irizarry, admitted as an expert in biostatistics, who testified that the risk for unvaccinated people to contract COVID-19 is more than 10 times higher compared to a person who was vaccinated.

Dr. Irizarry concluded that unvaccinated people are much more likely to be infected and hospitalized because of COVID-19. The testifying experts agreed that a vaccinated person's protection wanes six months after being vaccinated. However, Dr. Cardona clarified that although vaccine protection from infection wanes after six months, the protection against hospitalization and death remained high.

The evidence further showed that restrictions on unvaccinated persons' access to the locations covered under EO75 are not arbitrary. Dr. Cardona testified that in closed environments, particularly in spaces that are small, the COVID-19 virus can be extremely contagious. Dr. Cardona, who also serves as an adviser to the Secretary of Health and as a member of the Scientific Coalition appointed by the Governor of Puerto Rico, reported that there is a greater risk of transmission in enclosed spaces where people are eating and conversing without masks. Hearing, Dec. 9, at 1:35 PM. She went on to say that enclosed spaces could include Airbnb's, schools, movie theaters, restaurants, and gyms. Hearing, Dec. 9, at 1:36–1:38 PM. Defendants' biostatistician expert witness, Dr. Irizarry also explained that according to his statistical analysis, "the one place that comes out very clearly" in the data as a place where he sees more infections are "restaurants . . . . This is a place that is indoors, and you take your mask off." Hearing, Dec. 14, at 10:27 AM. He continued, "[T]he second highest that we saw were gyms, which are similar, you are indoors and you are breathing heavily." Hearing, Dec. 14, at 10:27–10:28 AM.

Both parties also introduced evidence regarding the positive correlation between the number of COVID-19 cases in Puerto Rico and hospitalizations, ICU referrals, and deaths— collectively labeled "adverse health outcomes." Dr. Joel Hay also testified as an expert witness for the Plaintiffs, admitted as an expert in public health economics. ECF No. 76 at 1. Dr. Hay

raised a principle called "Farr's law." Dr. Hay asserted that Farr's law is a "theme with most infectious agents. Over time, the virus, or the infectious agent . . . adapts to the host [and] becomes less lethal over time." Hearing, Dec. 6, at 11:06 AM. Therefore "through the natural process of, you might even call it evolution, the virus changes and becomes less lethal and more infectious." Hearing, Dec. 6, at 11:08 AM. Because of Farr's law and increased numbers of vaccinated people, Dr. Hay predicts that the number of COVID-19 cases will eventually cease to have an impact on the number of hospitalizations, ICU referrals, and deaths.

Defendants' experts, however, testified that if Farr's law applies to COVID-19, it has yet to eliminate the correlation between positive cases and adverse health outcomes. Dr. Cardona agreed that there is evidence that viruses do decline in deadliness over time, but that mutations in viruses do not guarantee this trajectory. Viruses, Dr. Cardona explained, can mutate to become both more infectious and more severe, and she referred to the example of the H1N1 swine flu in 2009. Hearing, Dec. 9, at 11:07 AM. Dr. Marzán, Defendant's expert epidemiologist, also acknowledged that it can be the behavior of certain infectious agents to become less lethal and more transmissible over time. Nevertheless, Dr. Marzán and Dr. Irizarry highlighted that the Delta wave, which was the second-to-last wave experienced in Puerto Rico before December 2021, was substantially more deadly than the wave the preceded it.[10] Dr. Irizarry therefore expressed doubt that Farr's law has manifested itself in Puerto Rico's COVID-19 outbreak.

Even assuming Farr's law applies to the COVID-19 virus—an opinion upon which the experts were split—the positive effect of the law has yet to be seen in Puerto Rico. Defendants' biostatistician, Dr. Irizarry, testified regarding two graphs he compiled using Puerto Rico's public data on the number of hospitalizations and deaths. Dr. Irizarry reported, and both graphs

---

[10] Plaintiff's public health economics expert, Dr. Hay, also acknowledged that the Delta wave was more deadly than the wave that preceded it.

clearly demonstrate, that for the last two COVID-19 outbreak "waves" in Puerto Rico, there continues to be a remarkably strong correlation between the number of cases and the number of hospitalizations and deaths. Exhibits F, G. Dr. Irizarry showed that a rise in positive COVID-19 cases "predicts hospitalizations that are going to happen in one or two weeks in the future." Hearing, Dec. 14, at 9:26 AM; Exhibit F. Likewise, Dr. Irizarry explained that an increase in the positivity rate in Puerto Rico precedes an increase in deaths by "between two and three weeks." Hearing, Dec. 14, at 9:29 AM; Exhibit G. It was Dr. Irizarry's opinion that using this predictive information, when case numbers begin to grow the Puerto Rico government has been able to implement restrictions which have limited the growth in cases and therefore limited the total number of hospitalizations and deaths. Dr. Cardona agreed with Dr. Irizarry. She conveyed that by interrupting transmission of the virus, public health officials were able to avoid greater numbers of hospitalizations and death that pose a threat of overwhelming the Puerto Rico health system.

Plaintiffs disagree that Puerto Rico's health system has ever been at risk, and Dr. Hay testified to that effect alluding to a graph that illustrates the percentage of hospital and ICU beds in Puerto Rico occupied by COVID-19 patients, the percentage of hospital and ICU beds occupied by other patients, and the percentage of available hospital and ICU beds. Exhibit 11. He asserted that since the beginning of the Pandemic in August 2020, whenever there was a "spike" in COVID-19 hospitalizations there was a "one-for-one decline in hospitalization for other reasons" so that "hospitals have stayed at 60 percent occupancy" for the entire pandemic period. Hearing, Dec. 6, at 11:17 AM; Exhibit 11. Based on that data, Dr. Hay concluded that hospitals in Puerto Rico have never been in danger of being overwhelmed.

Defendants' expert Dr. Cardona, on the other hand, opined that there was the "possibility" that the health system in Puerto Rico would have collapsed without greater restrictions. She testified that "the risk of putting the system in danger is established when the occupancy [in hospitals] is greater than 70 percent." Hearing, Dec. 9, at 2:48 PM. This level of occupancy is only 10 percent points higher than the occupancy Puerto Rico hospitals have maintained during the pandemic, according to the graph alluded to by Dr. Hay. Exhibit 11. Dr. Cardona estimated that there was a possibility that 600 to 700 COVID-19 hospitalizations in Puerto Rico would not allow for the treatment of other patients requiring immediate attention.

Dr. Marzán, Defendants' expert epidemiologist who also serves as the Chief Epidemiologist for the Puerto Rico Department of Health, also testified as to the risk of overwhelming hospitals in Puerto Rico. Dr. Marzán asserted that it is not useful to talk about an island-wide collapse of the health system, because the threat may be highest to hospitals on a local or regional level, especially small hospitals. She noted that in August 2021, during the Delta variant outbreak, there were individual hospitals that were unable to admit any more COVID-19 patients. Dr. Marzán also reported that recent health emergencies in Puerto Rico, such as that which followed Hurricane María, compromised the Puerto Rico health system, which led the Puerto Rico government to implement the greatest number of measures as possible to avoid a similar crisis.

In sum, the evidence shows that vaccination does appear to provide some heightened level of protection, albeit temporarily, against spreading the COVID-19 virus, because a vaccinated person's viral load decreases more rapidly after they contract the virus, making them less likely to spread the virus. A vaccinated person is also less likely to contract COVID-19 and be hospitalized or die due to the infection. Because unvaccinated persons pose a heightened risk

of infection, the government of Puerto Rico has an interest in preventing unvaccinated individuals from entering high-risk locations without proof of a negative test or a COVID-19 infection within the last three months. It was also not irrational, arbitrary, and beyond what is reasonably required for the government of Puerto Rico to center these restrictions on places like restaurants, bars, movie theaters, and stadiums where people may congregate together and remove their masks to eat and drink. As testified by several experts, these places pose a particular risk for infection.

The government of Puerto Rico has a compelling interest in preventing increasing spread of the COVID-19 virus because, as shown in the evidentiary hearing, there remains a strong correlation between number of infections and adverse health outcomes. In other words, there is not yet any evidence that a significant increase in cases will not produce a significant number of hospitalizations, ICU referrals, and deaths which pose a risk to overwhelming hospitals. The Puerto Rico government has a particular interest in ensuring that the health system does not become overwhelmed on the island, particularly because, as Dr. Cardona testified, Puerto Rico's status as an island makes it much more difficult to transport patients who require hospitalization to other states or territories. Thankfully, it appears that the Puerto Rico health system has never reached the point of collapse during this pandemic, but the evidence adduced during the hearing shows that outcome continues to be a possibility. Indeed, as the evidence demonstrated, collectively Puerto Rico's hospitals may have only had a 10 percentage point margin of occupancy before a risk of collapse might have become reality. Accordingly, while there continues to be a strong correlation between more COVID-19 cases and adverse health outcomes, the government of Puerto Rico has an interest in regulating access to places where spread may be especially prevalent to prevent overwhelming the health system.

Many of Plaintiffs' complaints center on a disagreement on policy with the government of Puerto Rico. Plaintiffs suggest, as a matter of policy, that ice cream shops like Tropical Chill, where patrons only spend a few minutes, and Ms. Vega, who makes no physical contact with her guests, should be subject to some sort of exemption. However, these cases illustrate the difficulty in crafting enforceable public policy to cover a broad variety of businesses. Plaintiffs also argue that requiring workers to test on a weekly basis, while requiring visitors to covered businesses to test 72 hours in advance shows that EO75 is arbitrary and capricious. ECF No. 35 at 14.[11] Plaintiffs also disagree that the challenged measures have effectively prevented overwhelming the Island's hospitals—and it is admittedly difficult to tell.[12]

However, the Puerto Rico government must draw lines with its policies, and a policy may still be rationally related to a legitimate government interest even if the policy is "not perfectly tailored to that end." Box v. Planned Parenthood of Indiana and Kentucky, Inc., 139 S. Ct. 1780, 1782 (2019) ("[T]he state need not have drawn 'the perfect line,' as long as 'the line actually drawn [is] a rational' one.") (internal citations omitted). As explained above, the specific policies being questioned in this case are rationally related to the compelling government interest of stopping the spread of the pandemic, and Plaintiffs have failed to show that they are arbitrary and far beyond what is reasonably required. The government of Puerto Rico has drawn rational lines, even if not perfect lines. Therefore, it is not proper for a court to second-guess the public health

---

[11] An argument could be made, however, that it is reasonable to impose more frequent testing on optional activities than for those, like employment, upon which people depend for their livelihood. Furthermore, unlike places covered by EO75 (e.g. bars, restaurants, etc.), which pose a higher risk because they are often enclosed spaces in which people generally remove their masks, not all workplace environments require removal of a mask in an enclosed space.

[12] The tension between the Plaintiffs and Defendants' views is best summarized as follows: From Plaintiffs' perspective, because Puerto Rico's health care system has never been overwhelmed, it is arbitrary, irrational, oppressive, and unreasonably burdensome for the Government of Puerto Rico to impose the restrictions and mandates found in EO75 and Regulation 138-A. Defendants, on the other hand, contend that it is precisely because of these tight restrictions and strict mandates that Puerto Rico's health system has not been overwhelmed.

experts on measures—even if more exceptions or fewer restrictions could be a more attractive policy option. In sum, restrictions on unvaccinated persons' activities in places covered by EO75 are rationally related to Puerto Rico's compelling health goals, and the mandates—though not necessarily without flaws and totally justifiable should circumstances change—are not arbitrary, oppressive, or unreasonable to a degree that fails to pass constitutional muster.

### iii.    Regulation 138-A

Plaintiff Llenza challenges Regulation 138-A because to work as a professional food manager, she is required to obtain a health certificate which she cannot do because she is unvaccinated. ECF No. 35 at 29–30. Ms. Llenza claims that she should be able to receive a health certificate because she had previously contracted COVID-19 and so has natural immunity. In support of that claim, Plaintiffs continually sought to introduce evidence that natural immunity is as robust and long lasting as vaccine induced immunity or better. For example, a recent study from Israel concluded that "natural immunity confers longer lasting and stronger protection against infection, symptomatic disease and hospitalization caused by the Delta variant of SARS-CoV-2 . . . ." Exhibit 46 at 2. The experts presented by both Plaintiffs and Defendants agreed that vaccine immunity lasts for only about six months, which is why booster shots have been developed. However, one of Plaintiffs' expert witnesses, Dr. Carrascal, went so far as to suggest that immunity for COVID-19, like immunity for measles and chickenpox, lasts for the entirety of a person's life after they were infected. Such an assertion lacks credibility in light of the other evidence, and Dr. Carrascal herself admitted that antibodies for COVID-19 decrease in a person over time. One of Defendants' expert witnesses, Dr. Cardona, testified that it is not yet clear how long natural immunity from COVID-19 infection actually lasts, and that it could last as long as 13 months. However, Doctors Cardona, Marzán, and Irizarry all reported that there are

documented cases of persons who contracted COVID-19 becoming reinfected with COVID-19 after 90 days.

In addition to the medical testimony, Plaintiffs also presented the testimony of lay witness Ofelia Otero Santiago ("Ms. Otero") who had a truly horrific experience with the first dose of the COVID-19 vaccination. Ms. Otero contracted COVID-19 in November 2020. After recovering from her COVID-19 infection, Ms. Otero received the first dose of the Pfizer vaccine in August 2021. In the days following her vaccination, Ms. Otero's left side of her body became swollen, she suffered pain from her head to her feet, and was unable to sleep for days. Her left side of her body also became paralyzed, and she began bleeding from burst capillaries in her left eye. Eventually, Ms. Otero passed out from her symptoms and had to be hospitalized. After this ordeal, Ms. Otero was counseled by several doctors who told her that her reaction was a result of excessive immunization. Dr. Cardona acknowledged that past scientific literature does speak of a hyperimmune response in persons who received too many doses of a tetanus vaccine in a short period of time.

Understandably, Ms. Otero does not want to get a second dose of a COVID-19 vaccine because of her extreme reaction to the first dose. Ms. Otero testified that before her adverse reaction to the vaccination, she was planning on opening a sportswear business. Ms. Otero believes that due to her situation she would not be able to obtain a health certificate under Regulation 138-A because she is not yet "fully vaccinated" after having only received one dose of the vaccine. Ms. Otero, however, has not attempted the process of obtaining a health certificate.

Perhaps the implication of this evidence is that Regulation 138-A should provide some sort of exemption to obtain a health certificate for someone who has contracted and recovered

from COVID-19 and who has natural immunity. However, the only Plaintiff who fits this description is Ms. Llenza. Ms. Llenza contends that because she has already contracted COVID-19, she has immunity from the virus, no longer needs to be vaccinated, and should be able to obtain a health certificate. In support of this, Plaintiffs introduced two lab tests from June 25 and September 17, 2021 which show that Ms. Llenza still had antibodies for the SARS-CoV-2 virus. Exhibit 43, 44.

Nevertheless, the Puerto Rico government, firstly, has a rational basis in requiring a health certificate for people who work in industries like that of Mr. Matos and occupations for which Ms. Llenza has received training. Mr. Matos works in food distribution, while Ms. Llenza is seeking employment in disaster recovery, food preparation, or medical billing. In all these industries, there is a rational and reasonable need for persons to have a health certificate to avoid spreading illness to others.[13]

Secondly, it does appear likely that natural immunity provides protection against COVID-19. However, as discussed above, the Plaintiffs failed to clarify with any certainty how long natural immunity may last, while Defendants' produced evidence that it may only last as long as 90 days. Based on this evidence, it is not arbitrary, for example, that EO75 specifies that a person with natural immunity may also enter the establishments covered by EO75 within three months of infection. However, Regulation 138-A does not provide an exemption whatsoever for persons with natural immunity unless an applicant for a health certificate can provide evidence that "the patient has a compromised immune system or there is a medical contraindication that prevents inoculation. This must be certified by a doctor authorized to practice in Puerto Rico or

---

[13] It is puzzling and difficult to see the rational basis as to why someone like Ophelia Otero would need to have a health certificate to open a clothing business, but because Ms. Otero is not a Plaintiff, the court cannot rule on that issue. Furthermore, even if Ms. Otero were a plaintiff, at the preliminary injunction hearing she testified that she is no longer currently seeking to open the clothing business and thus, has not sought a health certificate.

by the doctor who issues the health certificate." ECF No. 35-1 at 3. This type of exemption, Dr. Cardona testified, would presumably apply to a person like Ms. Otero, as long as a doctor provided a sufficient basis for why the person should not be vaccinated. Ms. Llenza, however, has not produced any evidence showing that there is a medical reason for her not to be vaccinated, and she has provided no evidence to believe she is at risk of having an immune reaction like Ms. Otero. Once again, this is a situation where the government of Puerto Rico has inevitably had to draw lines on what persons qualify for an exemption to vaccination for a health certificate. See Box, 139 S. Ct. at 1782 ("[T]he state need not have drawn 'the perfect line,' as long as the 'the line actually drawn [is] a rational' one.") (internal citations omitted).

The evidence is unclear how long natural immunity lasts, and it may last for as little as 90 days.[14] This evidence refutes any claim of arbitrariness on the part of the government. It was not irrational for the government of Puerto Rico to create a policy that does not recognize natural immunity for a health certificate if natural immunity may last such a short period of time. Plaintiffs therefore fail to show that Regulation 138-A is not rationally related to a legitimate government interest or that it is arbitrary, oppressive, unreasonable, and going far beyond what is reasonable for the protection of the public. If a person's natural immunity presents some sort of health risk to becoming vaccinated, there is an opportunity to receive a health exemption from a doctor.[15] Although Plaintiffs may prefer a different policy alternative, the policy decisions that public health officials have made is due some deference, and the court must not engage in policymaking.

---

[14] Although some evidence was presented that for some persons natural immunity could last for well over three months, insufficient scientific evidence was introduced at the preliminary injunction hearing to support the notion that on average, the government's 90 day window is too narrow.

[15] One flaw in the government's conduct is worth addressing. Dr. Cardona, Defendants' expert in public health, immunizations, infectious diseases, vaccine preventable diseases, and pediatry, and who also serves as an adviser to the Secretary of Health, acknowledged that communication was lacking with regard to the process required to obtain an exemption for the health certificate. For an exemption to be useful, the public must be aware of it.

In conclusion, Plaintiffs fail to carry their burden in showing likelihood of success on the merits for their substantive due process claims, both because the challenged government mandates do not violate the rights Plaintiffs raise, and because the government measures survive scrutiny under the <u>Jacobson</u> standard.

### c.  Whether EO 75 Violates Ms. Vega's Rights under the Religious Freedom Restoration Act[16]

Plaintiffs also argue that the requirement under EO75 that Ms. Vega verify vaccination status violates the Religious Freedom Restoration Act. ECF No. 7 at 19. Congress enacted RFRA to provide "very broad protection for religious liberty," and the law operates to exempt religious believers from laws of general applicability which nevertheless burden that believer's exercise of religion. <u>Burwell v. Hobby Lobby Stores, Inc.</u>, 573 U.S. 682, 694 (2014). To prevail on a RFRA claim, the plaintiff must first establish a prima facie case that the application of the challenged law "substantially burdens a sincere religious exercise." <u>Perrier-Bilbo v. United States</u>, 954 F.3d at 413, 431 (1st Cir. 2020). A plaintiff may sustain a RFRA claim with a "complicity-based objection," whereby the religious adherent believes that compliance with a government mandate obligates them to become complicit in a practice that violates their sincerely held religious beliefs. <u>Little Sisters of the Poor Saint Peter and Paul Home v. Pennsylvania</u>, 140 S. Ct. 2367, 2377 (2020) ("They sincerely believed that human life begins at conception and that, because the challenged methods of contraception risked causing the death of a human embryo, providing those methods of contraception to employees would make the employers complicit in abortion.").

---

[16] Puerto Rico is a territory of the United States. <u>See</u> <u>Franklin California Tax-Free Trust v. Puerto Rico</u>, 805 F.3d 322, 344 (1st Cir. 2015). Although the Supreme Court "has not had occasion to rule on the matter," it has recognized that that the appellate courts have held that RFRA "remains operative as to the Federal Government and federal territories and possessions." <u>Cutter v. Wilkinson</u>, 544 U.S. 709, 715 n.2 (2005).

Once a plaintiff has established that prima facie case, the burden shifts to the government. Burwell, 573 U.S. at 694–95. The Supreme Court in Burwell v. Hobby Lobby Stores, Inc. explained the process, writing, "If the Government substantially burdens a person's exercise of religion, under the Act that person is entitled to an exemption from the rule unless the Government demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." Burwell, 573 U.S. at 694–95 (internal quotations omitted).

Ms. Vega succeeds in demonstrating a sincere religious belief in objecting to vaccinations. Ms. Vega testified at the evidentiary hearing that because of her Christian faith she is particularly opposed to the COVID-19 vaccination, explaining that she believes that the vaccine mandates are a fulfillment of "Apocalypse 13 [Chapter 13 of the Book of Revelation of the Bible]" whereby all people will be "marked" in the end times. Hearing, Dec. 7, at 1:44 PM; 2:27 PM.[17] She stated that her "personal and religious interpretation is that we are reaching the last days, and with all of these impositions [her] interpretation is that this is the mark of the Beast." Hearing, Dec. 7, at 2:27 PM. Therefore, Ms. Vega stated that she is religiously opposed to all mandates requiring her to check for proof of vaccination or to ask for a negative COVID-19 test because such requirements are all part of the aforementioned marking process and her compliance makes her an "accomplice of everything." Hearing, Dec. 7, at 1:49–1:52 PM. Therefore, Ms. Vega raises a complicity-based objection to the COVID-19 mandates.

However, Ms. Vega failed to demonstrate a prima facie case of how checking for a negative COVID-19 test violates a sincerely held religious belief. With regard to her personal

---

[17] Ms. Vega's testimony elaborated her beliefs as follows: "[The Book of Revelation Chapter] 13 emphasizes a lot that we will all be marked, the poor, the rich, slaves, the small, old . . . Because of everything that is happening with the government where we are forced to get vaccinated, we can't go to restaurants or movie theaters those of us who are not vaccinated, just for that the word of God is being complied with." Hearing, Dec. 7, at 1:44 PM.

challenge to the vaccine mandates, Ms. Vega additionally explained that she is also religiously

opposed to vaccinations and COVID-19 testing because, as she described, "anything I do with

my body that does not comply with God's words . . . when I die I have to report to him, and I

have to worry about what I do with my body." Hearing, Dec. 7, at 1:45 PM. She asserted that she

believes all vaccinations to be sinful because they "are made with fetuses." Hearing, Dec. 7, at

2:31 PM. Ms. Vega also objects to COVID-19 testing based on introducing an unknown object

into her body. Regarding COVID-19 testing, she stated that "We don't know what's inside, how

they do it. I understand it is a small wooden stick that they put up in your nose. And I don't know

what that contains inside." Hearing, Dec. 7, at 1:48 PM. Upon further questioning by the court,

Ms. Vega admitted that she has never asked a physician what the "wooden stick" contains to

resolve her uncertainty. Hearing, Dec. 7, at 1:48 PM. Accordingly, Ms. Vega's objection to

COVID-19 tests has little to do with religious sincerity as much as with a willful decision not to

ascertain the contents of a COVID-19 swab. Unlike vaccines, which Ms. Vega opposes because

they may have been made in human fetal cells—a valid religious complicity objection according

to Burwell—Ms. Vega offers no sincere religious reason why she cannot ask for proof of a

COVID-19 test.

The Defendants argue that allowing business owners like Ms. Vega to require evidence of

a COVID-19 test instead of proof of vaccination complies both with the religious exemption

required by RFRA and also constitutes a less restrictive means to comply with the vaccine

mandate. ECF No. 20 at 13. Defendants' point is well taken. It is already clearly established that

stopping the spread of COVID-19 is a compelling government interest. Cuomo, 141 S. Ct. at 67.

When it comes to Ms. Vega, she has clearly expressed a prima facie reason why asking for

vaccination under her religious beliefs makes her complicit in the distribution of the "mark of the

Beast." However, she fails to demonstrate why COVID-19 tests truly violate a sincerely held religious belief, instead only testifying that she objects without having ascertained the contents of a COVID-19 swab. On this basis alone, Ms. Vega is not being forced to act in a complicit manner with EO75. Ms. Vega does not have to require or accept evidence of vaccination for guests to stay at Hillside Cabin. She can instead only require evidence of a negative COVID-19 test or evidence of a positive COVID-19 infection and proof of recovery in the last three months. As applied to Ms. Vega, EO75 cannot be said to violate Ms. Vega's free exercise rights under RFRA because requiring proof of COVID-19 testing is a less restrictive means of achieving the Puerto Rico government's compelling interest of limiting the spread of COVID-19. Therefore, Ms. Vega fails to show a substantial likelihood of success on that claim.

### d.  Whether EO 75 and Regulation 138-A Violate the Puerto Rico Constitution

Finally, invoking the supplemental jurisdiction of the federal court, Plaintiffs argue that EO75 violates the Puerto Rico Constitution. ECF No. 7 at 21–31. The Puerto Rico Supreme Court recognizes that "The separation of powers in Puerto Rico is expressly enshrined in Art. I, Sec. 2 of the Constitution of the Commonwealth of Puerto Rico." Colón-Cortés v. Pesquera, 150 D.P.R. 724, 2000 PR Sup. LEXIS 56 (2000). Plaintiffs argue that it is a violation of the separation of powers for the statute that authorizes the governor to act in an emergency, 25 L.P.R.A. § 3650, to grant him the power to enact executive orders like EO75. ECF No. 7 at 22–24. Instead, Plaintiffs urge that regulations like EO75 must be enacted through the Health Department which must act pursuant to the Puerto Rico Uniform Administrative Procedure Act, 3 L.P.R.A. § 9601-9713. ECF No. 7 at 24. Plaintiffs contend that the Uniform Procedure Act contains an emergency rulemaking procedure which would allow the governor to make a

regulation effective immediately subject to the regular rulemaking process. ECF No. 7 at 25 (citing 3 L.P.R.A. § 9623).

The first step of statutory interpretation and discerning the intent of the legislature is to look to the plain language of the statute. If the language is clear, then the job of the court is complete. <u>Bostock v. Clayton County, Georgia</u>, 140 S. Ct. 1731, 1750 (2020) ("This Court has explained many times over many years that, when the meaning of the statute's terms is plain, our job is at an end. The people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration.").

EO75 invokes 25 L.P.R.A. § 3650, or the "Puerto Rico Public Safety Department Act" as the source of its authority. An examination of the plain language of the statute reveals that the Puerto Rico Legislature did indeed authorize the Governor to issue regulations like EO75 after the Governor declares a state of emergency. Of particular interest is 25 L.P.R.A. § 3650(b)-(c) which provides:

> In emergency or disaster situations, the Governor of Puerto Rico may declare through a proclamation that a state of emergency or disaster exists, as the case may be, in all of the territory of Puerto Rico or part thereof. The Governor, for the duration of such state of emergency or disaster shall have, in addition to any others conferred by other laws, the following powers:
> . . .
> (b) May prescribe, amend, and revoke any regulations as well as issue, amend, and rescind such orders as deemed convenient which shall be in effect for the duration of the state of emergency or disaster. Regulations prescribed or orders issued during a state of emergency or disaster shall have force of law for the duration of the state of emergency or disaster.
> (c) May render effective any state regulations, orders, plans, or measures for emergency or disaster situations or modify them at his discretion.

25 L.P.R.A. § 3650(b)-(c). A reading of the statute demonstrates that the Puerto Rico Legislature did indeed act to grant the Governor the power to issue, amend, and rescind both "regulations" and "orders" during a state of emergency. 25 L.P.R.A. § 3650(b). These "[r]egulations

prescribed or orders" are to have force of law during the duration of the emergency. This

delegation is made directly to the Governor, and not to the Secretary of Health, and the plain

language makes no mention of the Puerto Rico Uniform Administrative Procedure Act—

emergency procedure or otherwise. It is therefore a reasonable construction of the statute that

under a state of emergency, the Governor does not have to act through the Uniform

Administrative Procedure Act to promulgate regulations pertaining to the emergency at issue.

The plain language is clear that the Puerto Rico Legislature intended to convey the power to the

Governor to create regulations like EO75.

Along these same lines, Plaintiffs argue that EO75 lacks the statutory authority to include

the threat of criminal penalties for non-compliance with the Executive Order. ECF No. 7 at 30–

31. Plaintiffs assert that neither 25 L.P.R.A. § 3650 nor the Health Department Act provides for a

criminal penalty. ECF No. 7 at 30. Once again, the language of the statute at issue is instructive.

Section 14 of EO75 describes the penalties for failing to comply with EO75 and makes reference

to 25 L.P.R.A. § 3654 of the Puerto Rico Department of Public Safety Act. Subsection (d) of 25

L.P.R.A. § 3654 provides,

> Any person who commits any of the following acts shall be punished by imprisonment
> for a term not to exceed six (6) months or a fine not to exceed five thousand dollars
> ($5,000), or both penalties at the discretion of the court:
> . . .
> (d) Persisting in carrying out any activity that endangers his life or the lives of other
> persons, after having been warned by the authorities once a hurricane warning has been
> issued or a state of emergency has been declared by the pertinent authorities, or while a
> state of emergency declared by the Governor of Puerto Rico through an Executive Order
> is in effect.

25 L.P.R.A. § 3654(d). On the basis of this statute alone, it is clear that the Legislature did

provide for criminal penalties when a person acts to endanger his life or the lives of other

persons while a state of emergency has been declared by the Governor of Puerto Rico through an

Executive Order. Plaintiffs seem to argue that 25 L.P.R.A. § 3654 is inapplicable because "noncompliance with an [executive order] is not included among these." ECF No. 7 at 30. However, as discussed above, the Governor of Puerto Rico has been empowered to issue executive orders during a state of emergency; therefore disobedience to an executive order that seeks to protect human life while a state of emergency is in effect is one sort of violation that would logically fall under the ambit of this statute.

Nevertheless, Plaintiffs argue that it cannot be a "sound construction" of 25 L.P.R.A. § 3650 to "say that the governor may issue any executive order he deems "convenient" with whatever content or impact upon fundamental rights he decides . . . ." ECF No. 7 at 24. These arguments more directly aim at the delegation doctrine rather than whether the Governor has been granted this power at all by the Legislature. Accordingly, Plaintiffs assert at length that if 25 L.P.R.A. § 3650 does indeed grant the authority to the Governor to issue executive orders like EO75, then such a delegation is an unconstitutional violation of the non-delegation doctrine. ECF No. 7 at 25–30. They argue that granting the Governor the power to make regulations and orders as he deems "convenient" is too broad of a guideline to constitute an intelligible principle. ECF No. 28–29.

In support of their argument Plaintiffs cite Gundy v. United States: "[A] statutory delegation is constitutional as long as Congress lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform." Gundy v. United States, 139 S. Ct. 2116, 2123 (2019) (internal citations omitted). In that case, however, the Supreme Court declined to strike down the Congressional grant of authority on grounds of the delegation doctrine. Indeed, in his concurrence, Justice Samuel Alito acknowledged that prevailing on a non-delegation doctrine argument has become an uphill

endeavor. Gundy, 139 S. Ct. at 2130–31 (Alito, J. concurring) ("Nevertheless, since 1935, the Court has uniformly rejected nondelegation arguments and has upheld provisions that authorized agencies to adopt important rules pursuant to extraordinarily capacious standards.").

Furthermore, insofar as the delegation doctrine applies in Puerto Rico, the Supreme Court has cautioned that Puerto Rico's unique judicial status merits a strong degree of "rigid deference" to local courts' interpretations of the Puerto Rico Constitution as applied to local statute. Corporación Insular de Seguros v. García, 680 F. Supp. 476, 482 (D.P.R. 1988) ("The factor, by now clear, is that issues of Puerto Rico law, including constitutional interpretations of local statutes, require a "rigid deference" to the actions of local courts.") (citing Díaz v. González, 261 U.S. 102, 105–106 (1923); Bonet v. Texas Co. of Puerto Rico, Inc., 308 U.S. 463, 470–471 (1940) ("For over sixty years this Court has consistently recognized the deference due interpretations of local law by (Puerto Rico) courts unless they appeared clearly wrong . . . . We now repeat once more the admonition.").

Defendants point out in their brief, with Plaintiffs' correctly acknowledging the court's expressions as dicta, that the Court of First Instance, San Juan Part, of the Commonwealth of Puerto Rico, in Amadeo et al. v. Pierluisi-Urrutia et al., wrote that, "In what is relevant to this case, Article 6.10 of the Puerto Rico Public Safety Department Act, Act No. 20-207 [25 L.P.R.A. § 3650], constitutes a clear example in which the Legislative Assembly conferred to the Governor ample faculties to act in protection of public interest in cases of emergency." ECF No. 18-1 at 17. Such a finding is consistent with the deference federal courts have so far granted to legislative decisions on managing the pandemic. As the Supreme Court held in Jacobson, "the police power of a state must be held to embrace, at least, such reasonable regulations established directly by legislative enactments as will protect the public health and the public safety."

Jacobson, 197 U.S. at 25. Indeed, the court in Jacobson recognized that in such emergency situations that this police power might be "exercised directly by the legislature, or by a local body acting under its authority." See Jacobson, 197 U.S. at 38. Furthermore, as declared by Justice John Roberts' concurrence in S. Bay United Pentecostal Church, "[t]he precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement. Our Constitution principally entrusts the safety and the health of the people to the politically accountable officials of the States." S. Bay United Pentecostal Church, 140 S. Ct. at 1613 (Roberts, C.J., concurring).

The guidelines provided by the Legislature are broad. The Puerto Rico Public Safety Department Act merely grants the Governor the power to issue regulations and orders "as deemed convenient" during a state of emergency and he is allowed to "modify them at his discretion." 25 L.P.R.A. § 3650(b)-(c). Perhaps in normal times such guidelines would violate an "intelligible principle." However, the public policy rationale of the Legislature's delegation of Power to the Governor during a public emergency is clear. In times of emergency, rather than relying upon the Legislature or a lengthy notice and comment period—which may take significantly more time than what is required to address the emergency—the Puerto Rico Legislature has conveyed that power to the Governor so that he can act quickly. Plaintiffs argue that because 25 L.P.R.A. § 3650 was enacted to "reform Puerto Rico's public security system . . . to combat criminality and violence in Puerto Rico", the law "cannot be construed to authorize the [G]overnor to declare an emergency of a completely different nature, such as learning to grapple with COVID-19." ECF No. 23–24. However, no legislature can precisely predict the contours of every state of emergency. Therefore, it would be unreasonable to expect a legislature to list all the potential emergencies imaginable before they could empower the governor to quickly take

action in an emergency. It would also be impractical to expect a legislature, as Plaintiffs assert, to define an intelligible principle with any more specificity for states of emergency because such guidelines may differ greatly depending on the state of emergency. The guidelines or "intelligible principle" may be dramatically different during a hurricane or flooding than during a pandemic or widespread civil unrest.

A word of caution, however, is in order. The grant of power to the Governor must be closely tied to the scientific and factual evidence triggering the state of emergency. Where "local officials are actively shaping their response to changing facts on the ground" and "[w]hen those officials undertake[] to act in areas fraught with medical and scientific uncertainties, their latitude must be especially broad." S. Bay United Pentecostal Church, 140 S. Ct. at 1613 (Roberts, C.J., concurring). We now know much more about COVID-19 and the virus that causes it than when S. Bay Pentecostal Church was decided in May 2020. As more knowledge is gained about the pandemic, scientific uncertainty may become less of a justification for expansive government powers and the curtailing of rights.

In conclusion, while admittedly broad, concerns of deference to local constitutional interpretation, public policy underlying the delegation of authority to the Governor, and the scientific evidence underlying the continued public emergency in Puerto Rico lead to the conclusion that the Legislature's statutory grant of authority to the Governor does not violate the delegation doctrine. Plaintiffs therefore have not shown a substantial likelihood of success on the merits based on the Puerto Rico constitutional challenge to EO75.

### B. Irreparable Injury

Turning now to the second prong, if a court finds that the moving party fails to show it is likely to succeed on the merits, it may, within its discretion deny relief without addressing the

remaining three factors. <u>New Comm. Wireless Servs., Inc. v. SprintCom, Inc.</u>, 287 F.3d 1, 9 (1st Cir. 2002). Nevertheless, the court will weigh whether the Plaintiffs' face any irreparable harm. The First Circuit has held that "infringements of free speech, association, privacy or other rights as to which temporary deprivation is viewed of such qualitative importance as to be irremediable by any subsequent relief." <u>Pub. Serv. Co. of New Hampshire v. West Newbury</u>, 835 F.2d 380, 382 (1st Cir. 1987).

As written, EO75 does not force any violation of bodily integrity, medical choice, or medical privacy for the Plaintiffs who object to having to undergo a test to engage in public activities. As discussed above, Section 10 of EO75 requires restaurants, bars, hair salons, hotels, and many other public places to check either proof of vaccination or proof of a COVID-19 test showing a negative result or of a positive result in the last three months accompanied by evidence of recovery. Businesses also have the option of operating at 50 percent capacity, which would allow it to serve customers without asking for proof of vaccination or a negative COVID-19 test. Tropical Chill has opted for this practice to avoid violating its customers' right to medical privacy. By way of this option, Plaintiffs can avoid violations to medical privacy rights, bodily integrity, and medical choice by restricting capacity to 50 percent in their own business, or by choosing to frequent businesses that only allow 50 percent capacity.[18] Yet, even if businesses did not have the option of operating at 50 percent capacity, and all visitors were required to show proof of vaccination or one of the required COVID-19 test results, the Plaintiffs' harm still cannot be deemed "irreparable" for the reasons explained below.

---

[18] The Plaintiffs' tendered "Second Rule 15(d) Supplemental Pleading" alleges that the Governor's current executive orders, specifically Executive Order 2021-081, now eliminate the 50 percent capacity option for affected business, meaning that the covered businesses must operate at 50 percent capacity <u>and</u> check vaccination and COVID-19 test status. ECF No. 95-1 at 2–3.

### a. Plaintiffs' Harm to Medical Privacy

Regarding Plaintiffs' harm to their medical privacy, the Puerto Rico government has undoubtedly placed a significant burden on Plaintiffs' social lives for refusing to relinquish some measure of medical privacy. EO75 places non-trivial social consequences on Plaintiffs' decision not to be vaccinated or their refusal to present a negative COVID-19 test. Plaintiffs cannot attend restaurants, concerts, bars, hotels, barber shops, or hair salons unless they allow covered businesses to invade their medical privacy. However, the invasion in this case is slight, and they are not being asked to open the entirety of their medical records to public scrutiny. Plaintiffs are only obligated to show either a proof of COVID-19 vaccination, proof of a negative COVID-19 test, or proof of a positive COVID-19 test within the last three months accompanied by proof of recovery. On that limited basis alone, it cannot be said that Plaintiffs' harm to their medical privacy is of "such qualitative importance as to be irremediable by any subsequent relief." Pub. Serv. Co. of New Hampshire, 835 F.2d at 382.

### b. Plaintiffs' Harm to Personal Autonomy, Bodily Integrity, and Medical Choice

Turning to Plaintiffs' claimed violations of personal autonomy, bodily integrity, and medical choice, Plaintiffs are undoubtably subject to harm, but it is not irreparable. Plaintiffs are not being forced to accept vaccination by EO75—the permanent introduction of substance into a person's body which is impossible to withdraw. Forced vaccination would represent a harm to bodily integrity and medical choice that is that clearly irreparable. However, COVID-19 testing is much less intrusive and results only in a temporary invasion of the body. Businesses continue to have the option of requiring a negative COVID-19 test rather than solely accepting proof of vaccination.

### c. **Plaintiffs' Economic Harm**

Finally, Plaintiffs do not face irreparable economic harm. Generally, economic harm is not irreparable to warrant protection under a preliminary injunction because "traditional economic damages can be remedied by compensatory awards, and thus do not rise to the level of being irreparable." Puerto Rico Hosp. Supply, Inc. v. Boston Scientific Corp., 426 F.3d 503, 507 (1st Cir. 2005). The only exception may be when losses are so large that they may be irreparable, as when "the potential economic loss is so great as to threaten the existence of the movant's business." Vaquería Tres Monjitas, 587 F.3d at 485 (internal citations omitted).

Tropical Chill demonstrated that its economic losses under the mandates are not trivial. Since the mandates went into effect, Mr. Vega testified that Tropical Chill suffered a loss in revenue of almost 20 percent. Hearing, Dec. 6, at 9:30 AM. Additionally, Tropical Chill is currently operating at a loss, Mr. Vega has not collected a salary in the month, and the stores have cut employee hours. Mr. Vega estimated that Tropical Chill would only be able to operate under the restrictions for 30 to 60 days before the losses would result in employee layoffs. However, Mr. Vega did not testify that Tropical Chill is facing economic failure or bankruptcy. Therefore, although Tropical Chill's losses are significant, they do not rise to the level of irreparable harm that would require a lesser showing of likelihood of success. The type of harm that Tropical Chill is suffering is the type of harm that is traditionally remedied through compensatory damages, not prospective injunctive relief.

Ms. Llenza faces a far graver risk of irreparable economic harm because of her decision not to get vaccinated because she might not be able to secure employment in her chosen fields without a health certificate. Ms. Llenza, however, failed to provide convincing evidence that the temporary deprivation to her job prospects is of such a qualitative importance to be irreparable.

Ms. Llenza was last employed as a field inspector for a private contractor in a local disaster relief program in Puerto Rico after Hurricane María. She worked in this position from February until April 2018. Since then, Ms. Llenza was unemployed and pursued training to advance her professional career. Despite that training, Ms. Llenza's explanation for not working since 2018 was because that she was "doing other things." Hearing, Dec. 8, at 10:05 AM. Ms. Llenza became certified as a "Professional Food Manager" in December 2019, but she did not secure a health certificate or seek work in food preparation immediately after being certified in December 2019. Exhibit 41. Instead, Ms. Llenza testified that she only began searching for work at the beginning of 2021.

If Ms. Llenza was facing irreparable harm from her unemployment, that harm would have long ago manifested itself during the lengthy period she was out of work before Regulation 138-A was issued. Ms. Llenza could have secured a health certificate and searched for employment between April 2018 and the beginning of 2021, but she did not. Ms. Llenza also could have secured a health certificate when she began looking for work in early 2021, long before the promulgation of Regulation 138-A in August 2021, but she also failed to do so. For the vast majority of the time that Ms. Llenza was out of work since April 2018, she was unemployed not because of her inability to get a health certificate under Regulation 138-A, but rather for other, unrelated reasons. Such significant delay in looking for work and in seeking a health certificate does not indicate a person who faces irreparable harm from unemployment. Ms. Llenza has been unemployed for nearly four years for reasons unrelated to Regulation 138-A. She therefore fails to show how her continued inability to get a health certificate because she chooses to remain unvaccinated is an irreparable harm.

### C.  Balance of the Equities

The third prong of the preliminary injunction inquiry requires a balancing of the equities which examines "he hardship that will befall the nonmovant if the injunction issues contrasted with the hardship that will befall the movant if the injunction does not issue . . ." Mercado-Salinas v. Bart Enterprises International, Ltd., 671 F.3d 12, 19 (1st Cir. 2011).

The movants, Plaintiffs, have made their hardships clear while facing the requirements of EO75 and Regulation 138-A. If the court does not issue a preliminary injunction Tropical Chill will continue to suffer financial losses under the Governor's mandates regulating vaccine and COVID-19 checks for businesses. Mr. Matos and Ms. Llenza will have to continue to expend time during the week to secure COVID-19 tests to be able to work or to continue to seek employment. Mr. Matos, Ms. Llenza, and Ms. Vega—if they so choose to attend restaurants, bars, hotels, and other places that check for vaccine status or negative test—will have to relinquish a measure of their liberty interests in medical choice by submitting to a COVID-19 test and will be required to disclose matters of medical privacy by demonstrating evidence of that test. Ms. Vega will also be required to ask, at very least, for evidence of a negative COVID-19 test for guests to stay at her short-term rental. To obtain a health certificate to work in her chosen fields, Ms. Llenza must either submit to vaccination or will have to present evidence from a physician of a medical reason for her ineligibility for vaccination. There is no doubt that as applied, EO75 and Regulation 138-A can burden important liberty or property interests held by the Plaintiffs, even if that burden is rationally related to a legitimate government interest.

However, on balance, the scientific evidence presented at the evidentiary hearing shows that the hardship to the Defendants is greater if a preliminary injunction were issued. The Governor of Puerto Rico and the Puerto Rico Health Department have issued these regulations to

prevent the spread of the COVID-19 virus and its attendant adverse health effects, which could include hospitalizations and deaths. At this time, evidence shows that continued growth of positive cases will result in more hospitalizations, ICU referrals, and deaths in Puerto Rico. This correlation means that uncontrolled spread poses a potential risk of overwhelming the health system of Puerto Rico. A collapse of the public health system would be catastrophic for Puerto Rico and a great risk to human life, and the weight of the hardship at this time outweighs the burden on the Plaintiffs' liberty or property interests.

### D.  Public Interest

The analysis of the balancing of the equities has a strong bearing on the public interest. Without a doubt, the public has an interest in returning to a state of normality in which their rights are not infringed by the current state of emergency. Granting the preliminary injunction could very well provide some relief from the lengthy state of emergency under which Puerto Rico residents have suffered patiently. However, another public interest is at stake because although Plaintiffs may be willing to shed the current restrictions in favor of freeing their currently burdened liberty and property interests, such a result "can sicken and even kill many others who did not consent to that trade-off." See Cassell v. Snyders, 990 F.3d 539, 550 (7th Cir. 2021). In such a way, the public also certainly has an interest in preventing the collapse of the health system in Puerto Rico. As discussed at length above, the evidence does not yet point to a significant reduction in the risk of that outcome, and this prong must also weigh in favor of denying prospective relief.

Nevertheless, the analysis applied to the balance of the equities and the public interest may change over time. As of December 10, 2021, the death rate in Puerto Rico was 0.1 per 100,000—an extremely small number. Exhibit 61. When asked about that number, Defendants'

expert epidemiologist, Dr. Marzán acknowledged that number was true but retorted "It's a low rate, but it is a preventable death." Hearing, Dec. 13, at 3:21 PM. A functioning society must accept some measure of risk to human life to enjoy the benefits of a modern existence. The question is where to draw the balance. The government is correct that in the past, and at this point, the threat of COVID-19 presents an unacceptable risk to human life and presents a risk of overwhelming the health system in Puerto Rico. However, over time, the SARS-CoV-2 virus may become less lethal, especially as vaccination increases, new treatments are developed, and the virus mutates. Such a future is what science, public health, and the patience of residents of Puerto Rico have striven to achieve. As the virus becomes less likely to overwhelm the capacities of public health, whether that be from natural evolution, vaccination, or natural immunity, or new treatments, the lines balancing the equities and supporting the public interest may have to be redrawn.

## V.    CONCLUSION

In conclusion, Plaintiffs have not shown a substantial likelihood of success on the merits, nor have they demonstrated a likelihood of irreparable harm absent interim relief. The balancing of the equities and the public interest also do not weigh in favor of granting the motion for preliminary injunction. After considering the arguments of the parties, the pertinent authorities, and the evidence produced at the evidentiary hearing, Plaintiffs' Motion for Preliminary Injunction should be DENIED.

The parties have fourteen (14) days to file any objections to this report and recommendation unless otherwise ordered by the court. Failure to file the same within the specified time waives the right to object to this report and recommendation. Fed. R. Civ. P. 72(b)(2); Fed. R. Civ. P. 6(c)(1)(B); Local Rule 72(d); see also 28 U.S.C. § 636(b)(1); Henley

Drilling Co. v. McGee, 36 F.3d 143, 150–51 (1st Cir. 1994); United States v. Valencia, 792 F.2d

4 (1st Cir. 1986).

     IT IS SO RECOMMENDED.

     In San Juan, Puerto Rico, this 17th day of January, 2022.

s/Marcos E. López
U.S. Magistrate Judge
